Craig A. Raabe
IZARD, KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
craabe@ikrlaw.com

Steve W. Berman (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Robert C. Hilliard (*pro hac vice forthcoming*)
HILLIARD MARTINEZ GONZALEZ L.L.P.
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
bobh@hmglawfirm.com

Jason A. Zweig (*pro hac vice forthcoming*)
Zoran Tasić (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
jasonz@hbsslaw.com
zorant@hbsslaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| George Cravens, Donald Boland, Venus Sykes, individually and in her capacity as representative of the Estate of Chris Sykes, Jarquisha Harris, Ronald Maranto, Scott Moser, Kileen Gromelski, Michael DeLuccia, Fernando Zaragoza, individually and on behalf of the Estate of Leticia Zaragoza, and Paul Burpulis, | Civil Action No. **19-cv-1683**<br><br>**COMPLAINT** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| Boehringer Ingelheim Pharmaceuticals, Inc., Chattem, Inc., GlaxoSmithKline plc, GlaxoSmithKline LLC, Pfizer, Inc., Sanofi-Aventis U.S. LLC, and Sanofi US Services Inc., | **October 25, 2019** |
| Defendants. | |

TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ................................................................................................ 1

II. PARTIES ........................................................................................................... 10

    A.  Plaintiffs ................................................................................................. 10

    B.  Defendants ............................................................................................. 15

        1.  Glaxo Defendants ....................................................................... 15

        2.  Sanofi Defendants ...................................................................... 16

        3.  Boehringer .................................................................................. 17

        4.  Pfizer, Inc. ................................................................................... 17

III. JURISDICTION AND VENUE ....................................................................... 18

IV. FACTUAL ALLEGATIONS ............................................................................ 18

    A.  A History of Zantac ............................................................................... 18

        1.  Glaxo has known of the dangers of ranitidine both before
            and after Zantac's commercial launch in 1981 ........................... 18

        2.  Zantac becomes wildly successful. ............................................ 24

        3.  Throughout the relevant period, and throughout each
            period of time each Defendant marketed and sold Zantac,
            the scientific community continued to raise concerns about
            NDMA formation from ranitidine. ............................................. 26

    B.  The Dangers of *N*-Nitrosodimethylamine (NDMA) ............................ 29

    C.  Defendants did not disclose to Plaintiffs, the FDA or anyone else
        that Zantac exposes users to high levels of the carcinogen NDMA,
        despite having actual or constructive knowledge of this fact. .................. 35

    D.  Most global health regulators, and manufacturers themselves, have
        recalled their Zantac and ranitidine products. ......................................... 35

V.  TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL .......................... 40

|  |  |  |  |
|---|---|---|---|
| A. | Discovery-Rule Tolling | .......................................... | 40 |
| B. | Fraudulent-Concealment Tolling | ................................ | 41 |
| C. | Estoppel | ........................................................ | 41 |
| D. | Continuing Tort | ................................................ | 42 |

VI. CLAIMS FOR RELIEF ........................................................ 42

COUNT I  STRICT PRODUCTS LIABILITY – DESIGN DEFECT ............................ 42

COUNT II  STRICT PRODUCTS LIABILITY – FAILURE TO WARN ....................... 45

COUNT III  CONNECTICUT PRODUCTS LIABILITY ACT, CONN. GEN.
      STAT. § 52-572N *ET SEQ.* ............................................ 47

COUNT IV  NEW JERSEY PRODUCTS LIABILITY ACT N.J. STAT. §§ 2A:58C-
      1 *ET SEQ.* .......................................................... 50

COUNT V  NEGLIGENCE AND GROSS NEGLIGENCE ................................... 51

COUNT VI  BATTERY ........................................................... 55

COUNT VII  FRAUD BY OMISSION ................................................ 57

COUNT VIII  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ................. 59

COUNT IX  MEDICAL MONITORING ............................................... 61

VII. PRAYER FOR RELIEF ...................................................... 64

VIII. JURY DEMAND ........................................................... 64

Plaintiff George Cravens, Donald Boland, Venus Sykes, individually and in her capacity as representative of the Estate of Chris Sykes, Jarquisha Harris, Ronald Maranto, Scott Moser, Kileen Gromelski, Michael DeLuccia, Fernando Zaragoza, individually and on behalf of the Estate of Leticia Zaragoza, and Paul Burpulis (collectively "Plaintiffs"), in their action against Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Chattem, Inc., Sanofi-Aventis U.S. LLC, and Sanofi US Services Inc. (collectively "Sanofi" or "Sanofi Defendants"), GlaxoSmithKline plc, GlaxoSmithKline LLC (collectively "Glaxo"), and Pfizer, Inc. allege the following based on personal knowledge, the investigation of counsel, and information and belief.

## I.    INTRODUCTION

1.      Recently, the public has been deluged by reports of serious impurities in pharmaceutical drugs. In 2019 alone, there have been dozens of recalls of blood pressure medications such as valsartan (and other angiotensin receptor blockers or "ARB") that contained dangerous levels of a potent carcinogen called *N*-Nitrosodimethylamine or NDMA. In the case of valsartan, the NDMA impurities resulted from shoddy manufacturing practices. This case also involves NDMA associated with a common drug. But unlike the NDMA present in valsartan, the NDMA associated with this common drug is *not* an impurity caused by faulty manufacturing processes. Rather, the NDMA is inherent to the drug itself.

2.      This case involves perhaps one of the most sinister and gravest public-health frauds in modern times. Since its launch in 1983, every manufacturer of prescription and over-the-counter Zantac has aggressively pushed a poisonous pill into the stream of commerce, while knowing that, when ingested, *every single tablet* (or every single dose) of Zantac, produces levels of NDMA in amounts that exceed the U.S. Food and Drug Administration's permissible daily limits for the carcinogen by *thousands* of times.

3.      As if the formation of NDMA in the body from Zantac use isn't bad enough, once it is present in the body, NDMA further metabolizes into other known carcinogens such as formaldehyde. In short, Zantac is nothing more than a cancerous poison that at all times was sold by Defendants with the actual or constructive knowledge that it was a poison. As a proximate result of Defendants' callous conduct, Plaintiffs have cancer or are at serious risk of developing cancer. This case seeks compensation for Plaintiffs' injuries, which were proximately caused by Defendants' egregious actions.

4.      NDMA and its metabolites damage DNA through a variety of mechanisms. NDMA or its metabolites can induce alkylating damage. NDMA can literally break the phosphodiester backbone of the double helix (*i.e.*, a "strand break"), directly induce mutations in the DNA sequence, it can chemically modify the DNA molecule, forming "DNA adducts," and split chromosomes.

5.      Zantac—the brand-name version of the generic drug ranitidine—is used to treat gastrointestinal conditions such as acid indigestion, heartburn, sour stomach, and gastroesophageal reflux disease.[1] Zantac was developed by Glaxo, and first sold in the United States in 1983 in prescription form; three years later, it became the first drug to total $1 billion in sales.[2]

6.      As recently as 2018, Zantac was widely used and remained one of the most popular tablet brands of antacid[3] in the United States. Currently, Zantac comes in several formulations. A

---

[1] *Ranitidine hydrochloride – Drug Summary*, PRESCRIBER'S DIGITAL REFERENCE (last visited Sept. 19, 2019), https://www.pdr.net/drug-summary/Zantac-150-and-300-Tablets-ranitidine-hydrochloride-241.3325.

[2] Richard Wright, M.D., *How Zantac Became the Best-Selling Drug in History*, 16(4) J. HEALTHCARE MARKETING 24 (Winter 1996).

[3] Zantac is not technically an antacid because it "works by reducing the amount of acid [the] stomach makes," whereas antacids "neutralize the acid that your stomach has already made."

300 mg dose that is available by prescription, and 150 mg (Zantac 150) and 75 mg (Zantac 75)

doses that are available over-the-counter.

7.      But Zantac's unprecedented sales were possible only because of a deception

perpetrated by all Zantac manufacturers since the drug hit the U.S. market in 1983.

8.      From Zantac's commercial launch in 1983 until recently, the Glaxo Defendants

have sold prescription formulations of Zantac. Sanofi has owned the U.S. rights to over-the-counter

Zantac since about January 2017 and has manufactured and distributed the drug from then until

the present. Previously, Defendant Boehringer owned the U.S. rights to over-the-counter Zantac

and manufactured and distributed the drug from about October 2006 to January 2017. Before that,

Defendant Pfizer (and one of its subsidiaries) manufactured and sold over-the-counter Zantac from

the time it first went over-the-counter in 1996 through approximately 2005.

9.      Each Defendant knew, or should have known, at all times that it sold Zantac, that

the drug has a critical and deleterious defect: When ingested, Zantac produces in the human body

high quantities of NDMA, a chemical that the World Health Organization has described as

"clearly carcinogenic."[4] The dangers of NDMA have been publicly known for over 40 years, well

---

See *Ranitidine, Oral Tablet*, HEALTHLINE (last visited Sept. 13, 2019), https://www.healthline.com/
health/ranitidine-oral-tablet. Nonetheless, this complaint sometimes refers to Zantac as an antacid
because this is often how the drug is referred to colloquially. *See, e.g., Leading antacid tablet brands in
the United States in 2018, based on sales*, STATISTA (last visited Sept. 13, 2019),
https://www.statista.com/statistics/194544/leading-us-antacid-tablet-brands-in-2013-based-on-sales/.

[4] R.G. Liteplo, et al., *Concise International Chemical Assessment Document 38:
N-Nitrosodimethylamine*, WORLD HEALTH ORGANIZATION (2002), *available at* https://www.who.int/
ipcs/publications/cicad/en/cicad38.pdf.

before Zantac hit the market.[5] NDMA itself belongs to a family of chemicals called *N*-nitrosamines, which the U.S. Environmental Protection Agency refers to as "potent carcinogens."[6] The dangers posed by NDMA are bad enough, but once Zantac introduces NDMA into the body, the NDMA breaks down into other harmful substances, such as formaldehyde—a known human carcinogen that has been linked to leukemia and other cancers.

10.     That Zantac forms NDMA was most recently confirmed in a series of scientific tests conducted by Valisure LLC and ValisureRX LLC (collectively "Valisure"). In those tests, Valisure "detected extremely high levels of NDMA in *all lots* [*of ranitidine*] *tested*, across multiple manufacturers of ranitidine products," including Zantac.[7]

11.     Valisure notified the FDA of its findings by filing a Citizen Petition on September 13, 2019.[8] In addition, Valisure submitted a copy of the Citizen Petition to the World Health Organization and the International Agency for the Research of Cancer to be included in the *IARC Monographs on the Valuation of Carcinogenic Risks to Humans* and to have ranitidine classified as a human carcinogen.[9]

---

[5] *See, e.g.,* Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979) ("As one of a family of carcinogens called nitrosamines, NDMA has caused cancer in nearly every laboratory animal tested so far.").

[6] https://www.epa.gov/sites/production/files/2014-03/documents/ffrrofactsheet_contaminant_ndma_january2014_final.pdf (last visited Oct. 17, 2019).

[7] Valisure Citizen Petition to FDA ("Citizen Petition") at 6 (emphasis added), *available at* https://www.valisure.com/blog/uncategorized/detection-of-ndma-in-raniditine/ (last visited Oct. 24, 2019).

[8] *Id.*

[9] *Id.* The IARC Monographs, "identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens." *See*

12.     Valisure is an "online pharmacy currently licensed in 38 states and an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization."[10] Valisure also is registered with the Drug Enforcement Administration and the FDA.[11] The tests conducted by Valisure show that "ranitidine can react with itself in standard analysis conditions . . . at high efficiency to produce NDMA at dangerous levels well in excess of the permissible daily intake limit for this probable carcinogen."[12]

13.     The FDA recently announced a permissible intake limit of **96 ng** of NDMA per day.[13] But even this limit may be too high: A public health statement issued 30 years ago by the Agency for Toxic Substances and Disease Registry warned of the dangers posed by NDMA, noting among other things that "high level short-term and *low level long-term exposures* [to NDMA] caused non-cancerous liver damage and/or cancer in animals [and] also usually resulted in internal bleeding and death."[14]

---

https://monographs.iarc.fr/home/iarc-monographs-general-information/ (last visited Oct. 13, 2019).

[10] Citizen Petition at 2.

[11] *Id.*

[12] *Id.*

[13] *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)*, FDA (last updated Aug. 28, 2019) (setting "interim limits for NDMA" and other nitrosamines at 96 ng/day for angiotensin II receptor blockers).

[14] Agency for Toxic Substances & Disease Registry, *Public Health Statement for n-Nitrosodimethylamine* 2 (Dec. 1989) (emphasis added), available at https://www.atsdr.cdc.gov/ToxProfiles/tp141-c1-b.pdf. The public health statement also notes that "[s]hort-term or long-term exposure of animals to water or food containing NDMA is also associated with serious effects, such as liver disease and death, at levels ranging from 5 to 50 ppm [parts per million] in water and 5 to 100 ppm in food." *Id.* at 3.

14.     Valisure's testing—which employs the FDA's gas chromatography/mass spectrometry ("GC/MS") protocol—detects **2,511,469 ng** of NDMA per a single 150 mg tablet of Zantac.[15] In other words, the FDA protocol detects a quantity of NDMA in each Zantac tablet that is more than **26,000 times** greater than the FDA's daily permissible NDMA intake levels.

15.     "The typical recommended dose of ranitidine for therapy of peptic ulcer disease in adults is 150 mg twice daily or 300 mg once nightly for 4 to 8 weeks, and maintenance doses of 150 mg once daily."[16] Moreover, chronic use of the drug is common "for therapy of heartburn and indigestion."[17]

16.     Thus, a typical user who is taking Zantac over eight weeks to treat peptic ulcer disease is exposed to more than 280,000,000 ng (or 0.28 grams) of NDMA based on the levels of NDMA detected through the FDA's GC/MS test. And a consumer who takes a 150 mg maintenance dose of Zantac once daily is exposed to 889,000,000 ng (0.889 grams) of NDMA annually. Again, the FDA's permissible intake limit of NDMA is 96 ng per day, which translates to just 0.000034 grams per year for consumers who take a daily 150 mg maintenance dose.

17.     Zantac is used not only by adults but is also given to children and teenagers to treat gastroesophageal reflux disease, among other things.[18] Further, Zantac is often used by pregnant

---

[15] Citizen Petition, *supra* footnote 7, at 6. Some generic versions of ranitidine demonstrated even higher amounts of NDMA. For example, the CVS version of Zantac contained NDMA levels of 3,267,968 ng of NDMA. *Id.*

[16] *Drug Record: Ranitidine*, NATIONAL INSTITUTES OF HEALTH (updated July 1, 2019), https://livertox.nih.gov/Ranitidine.htm.

[17] *Id.*

[18] *Treatment for GER & GERD in Children & Teens*, NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES (Apr. 2015), https://www.niddk.nih.gov/health-information/digestive-diseases/acid-reflux-ger-gerd-children-teens/treatment.

women to treat pregnancy-related heartburn symptoms; thus, not only is the pregnant woman exposed to NDMA, but her fetus is also exposed to this DNA-damaging compound.

18.     In addition to the FDA-recommended testing described above, when Valisure tested Zantac "in conditions simulating the human stomach," the quantity of NDMA detected was as high as 304,500 ng per tablet—**3,171 times** more than the amount that can be safely ingested daily.[19] This is consistent with recent peer-reviewed scientific literature, which has demonstrated the existence of dangerous levels of NDMA in the urine of those who have taken ranitidine.[20]

19.     In addition to testing Zantac for NDMA, Valisure also tested several other alternative drugs to Zantac, to determine if these drugs also contained NDMA. The drugs tested included Pepcid, Prilosec, Nexium, Prevacid, Protonix, AcipHex, and Dexilant. Valisure did not detect any NDMA in any of these drugs.[21]

20.     When the news broke on September 13, 2019, that Zantac exposed users to NDMA, "[g]lobal health regulators sounded a coordinated alarm."[22] As further described herein, most countries have pulled Zantac and generic ranitidine from the market. In the U.S., many pharmacies and ranitidine manufacturers themselves (including Defendants Glaxo and Sanofi) have pulled Zantac from their shelves or have recalled their products.

---

[19] Citizen Petition, *supra* footnote 7, at 6–7.

[20] Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

[21] Citizen Petition, *supra* footnote 7, at 15–16.

[22] Anna Edney & John Lauerman, *Carcinogen in Zantac and its generics triggers probes by FDA, EU*, THE HAMILTON SPECTATOR (Sept. 13, 2019), https://www.thespec.com/news-story/9595764-carcinogen-in-zantac-and-its-generics-triggers-probes-by-fda-eu/.

21.     Unfortunately, thus far, the FDA has done very little to protect the American public with respect to Zantac, and its messaging has been contradictory, confusing, and slow. Valisure first notified the FDA in June 2019 about the possibility that NDMA forms from ranitidine; the FDA did nothing, or at least made no public comments about the issue.[23] On September 13, 2019, the FDA issued its first statement acknowledging that Zantac contains NDMA but, in a seeming attempt to downplay the issue, claimed that the amount of NDMA detected was low: "The U.S. Food and Drug Administration has learned that some ranitidine medicines, including some products commonly known as the brand-name drug Zantac, contain a nitrosamine impurity called N-nitrosodimethylamine (NDMA) at low levels."[24] Further, although numerous regulators outside of the United States have cautioned those taking Zantac to consider taking an alternative medication given the availability of many safe alternative medicines, the FDA informed the American public that it need not discontinue taking OTC Zantac.[25]

22.     But then, seemingly in an about-face, on October 2, 2019, although it provided little detail, the FDA itself acknowledged that it found "unacceptable levels of NDMA in samples of ranitidine."[26] The FDA, however, never disclosed what those levels were, what tests it used, or any other information to help educate the public about its findings.

---

[23] https://www.valisure.com/blog/uncategorized/detection-of-ndma-in-raniditine/ (last visited Oct. 25, 2019).

[24] FDA, *Statement alerting patients and health care professionals of NDMA found in samples of Ranitidine* (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

[25] *FDA to review ranitidine after detecting cancer-causing contamination*, PHARMACEUTICAL TECHNOLOGY (Sept. 16, 2019), https://www.pharmaceutical-technology.com/news/fda-ranitidine-review/.

[26] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (last visited Oct. 13, 2019).

23.     Finally, however, it seems that the FDA is beginning to understand what this complaint lays bare: that when ingested, Zantac forms excessive amounts of cancer-causing compounds in the body. On October 24, an FDA spokesman stated that the FDA is currently "working to understand what happens to NDMA levels in the body, after ranitidine has been exposed to acid in the stomach."[27]

24.     All Defendants knew, or had reason to know, that Zantac exposes users to unsafe levels of the carcinogen NDMA: During the period that Defendants manufactured and distributed Zantac, numerous scientific studies were published showing, among other things, that ranitidine (the generic bioequivalent of Zantac) forms NDMA when placed in drinking water[28] and that a person who consumes ranitidine has a 400-fold increase of NDMA concentration in their urine.[29]

25.     Despite the weight of scientific evidence showing that Zantac exposed users to unsafe levels of the carcinogen NDMA, no Defendant ever disclosed this risk to the FDA, on the drug's label, or through any other means. Had Defendants disclosed that Zantac results in unsafe

---

[27] https://www.reuters.com/article/us-fda-heartburn-zantac/fda-investigating-whether-zantac-causes-carcinogens-to-form-in-users-idUSKBN1X32NA (last visited Oct. 25, 2019).

[28] *See, e.g.,* Massimiliano Sgroi, et al., *N-Nitrosodimethylamine (NDMA) and its precursors in water and wastewater: A review of formation and removal*, 191 CHEMOSPHERE 685 (Oct. 15, 2017); Yong Dong Liu, et al., *Formation Mechanism of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: A Computational Study*, 48 ENVTL. SCI. & TECHNOLOGY 8653 (June 26, 2014); Julien Le Roux, et al., *Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation*, 45 WATER RESEARCH 3164 (Mar. 26, 2011); Ruqiao Shen & Susan A. Andrews, *Demonstration of 20 pharmaceuticals and personal care products (PPCPs) as nitrosamine precursors during chloramine disinfection*, 45 WATER RESEARCH 944 (Oct. 13, 2010); Giovanni Brambilla & Antonietta Martelli, *Update on genotoxicity and carcinogenicity testing of 472 marketed pharmaceuticals*, 681 MUTATION RESEARCH 209 (Sept. 19, 2008); Giovanni Brambilla & Antonietta Martelli, *Genotoxic and carcinogenic risk to humans of drug–nitrite interaction products*, 635 MUTATION RESEARCH 17 (Dec. 6, 2006).

[29] Zeng & Mitch, *supra* footnote 20.

levels of NDMA in the human body, no person, let alone a reasonable person, would have consumed Zantac (or its generic equivalent). Instead, Defendants put profits over safety and aggressively pushed a dangerous drug into the marketplace, exposing millions of people to cancer.

26.     Defendants' conduct has proximately caused the Plaintiffs' injuries.

## II.     PARTIES

### A.     Plaintiffs

27.     Plaintiff George Cravens is a resident of Cushing, Oklahoma. Plaintiff Cravens began purchasing and ingesting Zantac in or around 1988. From then on, Plaintiff Cravens ingested at least either Zantac 150 or Zantac 300 on average twice a day, seven days a week. As a direct and proximate result of ingesting Zantac, Plaintiff contracted colorectal cancer in or around 2017. Had Plaintiff been informed that taking Zantac would expose him to unsafe quantities of NDMA such that it could and did cause him to contract colorectal cancer, he never would have purchased or ingested Zantac. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based Zantac products, and their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

28.     Plaintiff Kileen D. Gromelski is a resident of Manchester, Connecticut. Plaintiff Gromelski began purchasing and ingesting Zantac in or around 1989. From then on, Plaintiff Gromelski ingested at least Zantac 300 on average twice per week. As a direct and proximate result of ingesting Zantac, Plaintiff contracted kidney cancer in or around 2012. Had Plaintiff been

informed that taking Zantac would expose her to unsafe quantities of NDMA such that it could

and did cause her to contract kidney cancer, she never would have purchased or ingested Zantac.

Plaintiff required and incurred and will continue to require and incur expenses in connection with

medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based

Zantac products, and their unlawful conduct concerning Zantac's design, manufacture, marketing,

and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and

loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of

earning capacity, and other injuries and damages to be proven at trial.

29.     Plaintiff Venus Sykes, individually and as a representative of the Estate of Chris

Sykes, is a resident of Chicago Heights, Illinois. Chris Sykes passed away on or about April 2019.

Chris Sykes began purchasing and ingesting Zantac in or around 1990. From then on, Chris Sykes

ingested Zantac 150 on average three times per day. As a direct and proximate result of ingesting

Zantac, Chris Sykes contracted stomach cancer in or around 2016. Had Chris Sykes been informed

that taking Zantac would expose him to unsafe quantities of NDMA such that it could and did

cause him to contract stomach cancer, he never would have purchased or ingested Zantac. Chris

Sykes required and incurred expenses in connection with medical treatment as a result of his

stomach cancer, which were caused by Defendants' ranitidine-based Zantac products, and their

unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Chris Sykes

endured pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries,

suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be

proven at trial.

30.     Plaintiff Jarquisha Harris is a resident of Milwaukee, Wisconsin. Plaintiff Harris began purchasing and ingesting Zantac in or around 2004. From then on, Plaintiff Harris ingested Zantac 75 and/or Zantac 150 on average two times per day. As a direct and proximate result of ingesting Zantac, Plaintiff contracted stomach cancer in or around 2018. Had Plaintiff been informed that taking Zantac would expose her to unsafe quantities of NDMA such that it could and did cause her to contract stomach cancer, she never would have purchased or ingested Zantac. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based Zantac products, and their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

31.     Plaintiff Ronald Maranto is a resident of Millington, Maryland. Plaintiff Maranto began purchasing and ingesting Zantac in or around 2008. From then on, Plaintiff Maranto ingested Zantac 75 and/or Zantac 150 on average three times per week. As a direct and proximate result of ingesting Zantac, Plaintiff contracted bladder cancer in or around 2013. Had Plaintiff been informed that taking Zantac would expose him to unsafe quantities of NDMA such that it could and did cause him to contract bladder cancer, he never would have purchased or ingested Zantac. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based Zantac products, and their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Plaintiff has endured and will continue to endure pain,

suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

32.     Plaintiff Scott Moser is a resident of Austin, Texas. Plaintiff Moser began purchasing and ingesting Zantac in or around 1998. From then on, Plaintiff Moser ingested Zantac 150 on average once per day. As a direct and proximate result of ingesting Zantac, Plaintiff contracted colorectal cancer in or around 2006. Had Plaintiff been informed that taking Zantac would expose him to unsafe quantities of NDMA such that it could and did cause him to contract colorectal cancer, he never would have purchased or ingested Zantac. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based Zantac products, and their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

33.     Plaintiff Donald Boland is a resident of Punta Gorda, Florida. Plaintiff Boland began purchasing and ingesting Zantac in or around 2002. From then on, Plaintiff Boland ingested Zantac 150 on average three times per day. As a direct and proximate result of ingesting Zantac, Plaintiff contracted esophageal cancer. Had Plaintiff been informed that taking Zantac would expose him to unsafe quantities of NDMA such that it could and did cause him to contract esophageal cancer, he never would have purchased or ingested Zantac. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based Zantac products, and

their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

34.    Plaintiff Michael DeLuccia is a resident of Egg Harbor Township, New Jersey. Plaintiff DeLuccia began purchasing and ingesting Zantac in or around 2001. From then on, Plaintiff DeLuccia ingested Zantac 75 and/or Zantac 150 on average three times per day. As a direct and proximate result of ingesting Zantac, Plaintiff contracted esophageal cancer in or around 2017. Had Plaintiff been informed that taking Zantac would expose him to unsafe quantities of NDMA such that it could and did cause him to contract esophageal cancer, he never would have purchased or ingested Zantac. Plaintiff required and incurred and will continue to require and incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based Zantac products, and their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, and loss of enjoyment of life as a result of his injuries, has suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

35.    Plaintiff Fernando Zaragoza, individually and on behalf of the Estate of Leticia Zaragoza, is a resident of San Pedro, California. Leticia Zaragoza began purchasing and ingesting Zantac in or around 1989. From then on, Leticia Zaragoza ingested Zantac 150 and generic ranitidine on average twice a day. As a direct and proximate result of ingesting Zantac and generic ranitidine, Leticia Zaragoza contracted esophageal cancer in or around August 2014 and passed

away in May 2015. Had Leticia Zaragoza been informed that taking Zantac and generic ranitidine would expose her to unsafe quantities of NDMA such that they could and did cause her to contract esophageal cancer, she never would have purchased or ingested Zantac or generic ranitidine. Leticia Zaragoza required and incurred expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' ranitidine-based Zantac products and generic ranitidine, and their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale. Leticia Zaragoza endured pain, suffering, mental anguish, and loss of enjoyment of life as a result of her injuries, suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

36.     Plaintiff Paul Burpulis is a resident of Sicklerville, New Jersey. Plaintiff Burpulis began purchasing and ingesting Zantac in or around 1998. From then on, Plaintiff Burpulis ingested Zantac 150 on average two times per day. As a direct and proximate result of ingesting Zantac, Plaintiff is at an increased risk of developing cancer. Had Plaintiff been informed that taking Zantac would expose him to unsafe quantities of NDMA such that it could cause him to contract cancer, he never would have purchased or ingested Zantac. Plaintiff is at an increased risk of developing cancer, which was caused by Defendants' ranitidine-based Zantac products, and their unlawful conduct concerning Zantac's design, manufacture, marketing, and sale.

**B.     Defendants**

**1.     Glaxo Defendants**

37.     Defendant GlaxoSmithKline plc, is an English corporation with its principal place of business at 980 Great West Road, Brentford, Middlesex, England. Defendant GlaxoSmithKline plc is the successor-in-interest to the companies that initially developed, patented, and commercialized the molecule known as ranitidine. Ranitidine was initially developed by Allen &

Hanburys Ltd. Allen & Hanburys was acquired by Glaxo Labs Ltd. in 1958,[30] and thus, at the time ranitidine was discovered in the late 1970s, Allen & Hanburys was a subsidiary of Glaxo. Allen & Hanburys Ltd. was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office in December 1978, which covered the ranitidine molecule. GlaxoSmithKline plc also conducted the clinical and other trials associated with Glaxo's New Drug Application (NDA 18703) submitted to the FDA for Zantac. In 1983, Glaxo Holdings, Ltd. was awarded approval by the U.S. FDA to sell Zantac in the United States.

38.     Defendant GlaxoSmithKline LLC is a Delaware limited liability corporation with its principal place of business in Philadelphia, Pennsylvania. Since 1983, GlaxoSmithKline LLC, either directly, or through a subsidiary, marketed prescription forms of Zantac in the United States.

39.     Defendants GlaxoSmithKline plc and GlaxoSmithKline LLC (collectively "Glaxo"), from 1983 through 1996, had exclusivity concerning Zantac and were the sole manufacturer and seller of prescription forms of Zantac. Following 1996, Glaxo also sold over-the-counter versions of Zantac and continued to sell the prescription version of Zantac until recently.

**2.     Sanofi Defendants**

40.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly-owned subsidiary of the French company Sanofi.

---

[30] *See, e.g.,* p. 330, "Glaxo: A History to 1962." R. P. T. Davenport-Hines, Judy Slinn, Cambridge University Press, Nov 26, 1992.

41.     Defendant Sanofi US Services Inc. is a Delaware corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly-owned subsidiary of the French company Sanofi.

42.     Defendant Chattem, Inc. is a Tennessee corporation with a principal place of business at 1715 West 38th Street Chattanooga, Tennessee 37409, and is a wholly-owned subsidiary of the French company Sanofi.

43.     Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Chattem, Inc. (collectively "Sanofi" or "Sanofi Defendants") controlled the U.S. rights to over-the-counter Zantac from about January 2017 to the present and manufactured and distributed the drug in the United States during that period.

### 3.     Boehringer

44.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") is a Delaware corporation with a principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877, and is a subsidiary of the German company Boehringer Ingelheim Corporation. Boehringer owned the U.S. rights to over-the-counter Zantac from about October 2006 to January 2017, and manufactured and distributed the drug in the United States during that period.

### 4.     Pfizer, Inc.

45.     Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with a principal place of business at 235 East 42nd Street, New York, New York. From approximately 1996 through 1999, Pfizer's now subsidiary, Warner-Lambert Company, owned the rights to manufacture, market, and sell over-the-counter Zantac, and Warner-Lambert manufactured, marketed, and sold over-the-counter Zantac throughout the United States during that period. In or around 2000, Defendant

Pfizer acquired Warner-Lambert, and Warner-Lambert merged into Pfizer.[31] From 2000 through approximately 2005, Pfizer possessed the rights to manufacture, market, and sell over-the-counter Zantac, and Pfizer manufactured, marketed and sold over-the-counter Zantac throughout the United States during that period through its Consumer Healthcare division.

## III.   JURISDICTION AND VENUE

46.     Jurisdiction exists under 28 U.S.C. § 1332(a), as well as under 28 U.S.C. § 1367(a), because Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

47.     The Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in this District. Defendants' unlawful conduct has injured persons residing in, located in, or doing business throughout this District.

48.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), in that each Defendant transacts business in, is found in, and/or has agents in this district, and because a substantial part of the events giving rise to this action occurred within this district.

## IV.   FACTUAL ALLEGATIONS

**A.     A History of Zantac**

**1.     Glaxo has known of the dangers of ranitidine both before and after Zantac's commercial launch in 1981.**

49.     Zantac/ranitidine belongs to a class of medications called histamine $H_2$-receptor antagonists (or $H_2$ blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal

---

[31] https://www.pfizer.com/about/history/pfizer_warner_lambert (last visited Oct. 13, 2019).

conditions.[32] Ranitidine was discovered by John Bradshaw in 1976.[33] Mr. Bradshaw, who is

deceased, discovered ranitidine while working as a chemist for Allen and Hanburys, which was

acquired by Glaxo in 1958. Glaxo specifically developed ranitidine in response to the then leading

$H_2$ blocker, cimetidine (Tagamet).[34] At the time of its discovery and launch, Glaxo touted the safety

and effectiveness of ranitidine over competing drugs like cimetidine.[35]

      50.     Bradshaw, and his co-inventors, Barry J. Price, and John W. Clitherow, also of Allen

& Hanburys Ltd. in London, England, applied for a patent with U.S. Patent and Trademark

Office on July 25, 1977, to patent ranitidine. The patent was granted on December 5, 1978, and

Allen & Hanburys was issued patent No. 4,128,658 by the U.S. PTO.

      51.     At the time that ranitidine was developed, there was already existing scientific

literature strongly suggesting that drugs like ranitidine, which contain a dimethylamine (*DMA*)

group, are highly likely to form NDMA, when combined with other substances like, for example,

nitrite found in the body. The dangers of NDMA formation from ranitidine should have been

obvious to Glaxo. For example, one taking Zantac would likely be doing so in connection with a

meal. Many meals contain additional nitrates above that which is found naturally in the body.

Bacteria found within the saliva and stomach, or enzymes in the body, can *reduce* the nitrates ($NO_3$)

found in food into nitrites ($NO_2$). Additionally, some nitrites are found naturally in food or added

---

    [32] *Histamine H2 Antagonist (Oral Route, Injection Route, Intravenous Route)*, MAYO CLINIC (last
updated Aug. 1, 2019), https://www.mayoclinic.org/drugs-supplements/histamine-h2-antagonist-
oral-route-injection-route-intravenous-route/description/drg-20068584.

    [33] https://blogs.sciencemag.org/pipeline/archives/2011/11/18/two_from_glaxos_old_days
(Last visited Oct. 14 2019).

    [34] https://wikilawinfo.blogspot.com/2018/06/ranitidine.html (last visited Oct. 14, 2019).

    [35] *Id.*

as a preservative. Thus, at the time of ranitidine's discovery, Glaxo scientists should have known that the very events that would lead one to take Zantac, also put such person at risk of NDMA formation from Zantac due to increased nitrite levels in the body reacting with the ranitidine or its constituents.

52.     Further, in 1981, the very year Zantac was launched commercially outside of the US, two exchanges in *The Lancet*, one of which involving Glaxo, discussed the potential toxicity of cimetidine and ranitidine. Cimetidine, also an $H_2$ blocker, has a similar chemical structure to ranitidine. *The Lancet* was and is one of the most widely read and respected medical and scientific publications, and thus, Glaxo (and the other Defendants) would have been aware of material related to ranitidine.

53.     In one exchange, Dr. Silvio de Flora, an Italian researcher from the University of Genoa, wrote into *The Lancet* describing how the researchers detected "mutagenic nitroso derivatives" *in vitro* for both cimetidine as well as ranitidine.[36] De Flora did recognize that his studies were *in vitro*, and that, as such, they weren't perfectly predictive of how ranitidine would perform in humans. Glaxo was aware of this article because it specifically responded to it in *The Lancet* and sought to try and discredit de Flora's research. In its response, Glaxo cited to a study it had recently performed on ranitidine itself, which appears to have been flawed. Notwithstanding that the study was likely flawed, Glaxo nonetheless admitted to detecting a "product" that was "mutagenic" in ranitidine, although it failed to clearly specify what that "product" was.[37]

---

[36] S. De Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, THE LANCET at pp. 993-994 (Oct. 31, 1981)

[37] R.T. Brittain, D.M. Harris, L.E. Martin, D. Poynter, B.J. Price, *The Safety of Ranitidine*, THE LANCET, p. 1119 (Nov. 14, 1981). The article notes that these researchers are from "Glaxo Group Research Ltd." in England.

54.      In a second set of articles in *The Lancet* around the same time as the de Flora article, medical researchers from England discussed a study they performed on 140 human patients taking cimetidine. Their study observed that those who took cimetidine had a much higher level of *N*-nitrosamines than those in a control group who didn't take cimetidine.[38] In response, Roger Brimblecombe, a researcher from Smith Kline and French Research, Ltd.,[39] criticized the research performed by Reed and referenced unnamed "extensive studies" purportedly claiming that they demonstrate no "aetiological link between cimetidine treatment and the development of gastric cancer."[40] Importantly, Brimblecombe also stated that, "[t]he hypotheses raised by Reed and his colleagues are important and have been publicly and extensively discussed over the past two and half years. A great deal of research, both in our laboratories and in others, is in progress."[41] This clearly demonstrates that the formation of nitrosamines related to cimetidine and ranitidine, was one that was known to Glaxo and others, as it was a subject of much discussion in the scientific community at this time.

---

[38] P. I. Reed, K. Haines, P.L.R. Smith, F.R. House, C.L. Walters, *Effect of Cimetidine on Gastric Juice N-Nitrosamine Concentration*, THE LANCET (Sept. 12, 1981).

[39] Smith Kline and French was part of the Smith Kline Beecham group, which merged with Glaxo in or around 2000. https://www.gsk.com/media/4573/300yrs-of-gsk.pdf (last visited Oct. 18, 2019). Smith Kline and French was the innovator and manufacturer of cimetidine (Tagamet). https://www.acs.org/content/acs/en/education/whatischemistry/landmarks/ cimetidinetagamet.html (last visited Oct. 21, 2019).

[40] Roger Brimblecombe, *Cimetidine, Nitrosation, and Carcinogenicity*, THE LANCET at pp. 686-687 (Sep. 26, 1981)

[41] *Id.*

55.     On December 5, 1981, Dr. Reed then responded to Brimblecombe, noting that, among other things, the studies Brimblecombe relied upon have been harshly criticized by others.[42] Reed also noted, "[d]ebate on N-nitroso compounds and human gastric cancer continues but some involvement seems likely . . . . If N-nitrosamine concentrations are raised in certain conditions with an increased risk of gastric cancer then this is a hint which must not be ignored."[43] Dr. Reed and his co-authors sounded the alarm on Zantac, but no one, including Glaxo, listened.

56.     In 1983, a further study was published, this time specifically relating to ranitidine. Dr. Silvio de Flora (the same scientist who authored the 1981 piece in *The Lancet* that Glaxo sought to discredit) and a group of researchers from the University of Genoa in Italy published a study specifically describing the formation of *N*-nitrosamines from ranitidine and an excess of nitrite under certain conditions.[44] On information and belief, Glaxo, and the other Defendants, were aware of this study.

57.     Further, also in 1983, yet another article was published specifically implicating the toxicity of ranitidine. Another group of Italian researchers from the University of Genoa discovered that *in vitro*, and under certain conditions, ranitidine had the tendency to form DNA-damaging nitroso compounds (like NDMA). Although the study was done on hamsters, and utilized conditions not necessarily identical to those that would be found in the human body, the study called for more research to be done into what conditions nitroso compounds formed as a

---

[42] P. I. Reed, K. Haines, C.L. Walters, S.L.R. Smith, and F.R. House, *Cimetidine, Nitrosation, and Carcinogenicity*, THE LANCET at pp. 1281-1282 (Dec. 5, 1981).

[43] *Id.*

[44] Silvio De Flora, Carlo Bennicelli, Anna Camoirano, and Patrizia Zanacchi, *Genotoxicity of nitrosated ranitidine*, CARCINOGENESIS, Vol. 4, No. 3, pp. 255-260 (1983).

result of ranitidine ingestion.[45] On information and belief, Glaxo, and the other Defendants, were aware of this study.

58.     Further evidence of Glaxo's knowledge that Zantac formed NDMA in the body comes from a human study it was involved in and that was published in 1987.[46] In that study, the researchers tracked 15 patients who took ranitidine and had their gastric juice examined following ingestion of Zantac. Critically, instead of using the gold standard assay at the time (and which remains the case today) — mass spectrometry — to detect for the presence of nitrosamines in the human subjects, Glaxo used a nitrogen-oxide (i.e., nitric oxide, NO) assay which essentially was designed not to find nitrosamines.

59.     Although the assay allegedly can detect N-nitrosamines, the sensitivity of the assay to detect NDMA is not established within the peer-reviewed literature. When the study team tested gastric fluid samples containing ranitidine, the nitrogen oxide assay indicated the presence of N-nitroso compounds (e.g., NDMA).[47] However, rather than exploring this further, the authors claimed that these results were "fals[e]" and then restricted all tests to "ranitidine free samples," in order to avoid high readings of N-nitroso compounds.[48] Upon information and belief, these results were not false, and in fact, were a warning sign to Glaxo scientists that ranitidine did generate carcinogenic N-nitroso compounds like NDMA. Scientists at Valisure have demonstrated that

---

[45] Annalisa Maura, Albiana Pino, Luigi Robbiano, Enrica Cajelli, Renata Finollo, Marco Cavanna and Giovanni Brambilla, DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells, TOXICOLOGY LETTERS, 18, 97-102 (1983).

[46] See J Meyrick Thomas, JJ Misiewicz, AR Cook, MJ Hill, PLR Smith, CL Walters, JK Forster, LE Martin, and DF Woodings, Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents, 28 GUT. At pp. 726-738 (1987).

[47] Id. at p. 730.

[48] Id.

when ranitidine is incubated in simulated gastric fluid with nitrite, high levels of NDMA are formed. However, rather than exploring this issue further, the study team simply did not test any study samples that had ranitidine in them.

60.     In fact, on information and belief, Glaxo never used a mass spectrometry assay to test for the presence of nitrosamines in this study, or, in any of the studies and trials it did in connection with its trials associated with its ranitidine NDA. That is because, as explained above, when using GC/MS (which requires heating of up to 130 degrees Celsius), excessive amounts of nitrosamines are formed. And, had Glaxo used a GC/MS assay, which would have necessarily resulted in the formation of large amounts of NDMA, the FDA would never have approved Zantac as being safe.

### 2.     Zantac becomes wildly successful.

61.     Zantac was approved for prescription use by the FDA in 1983.[49] Due in large part to Glaxo's marketing strategy, Zantac was a wildly successful drug, reaching $1 billion in total sales in December 1986.[50] As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . . . enabled the product to dominate the acid/peptic marketplace."[51] Critically, the marketing strategy that led to Zantac's success emphasized the purported safety of the drug.[52]

---

[49] Wright, *supra* footnote 2, at 26.

[50] *See* Wright, *supra* footnote 2, at 27.

[51] *See* Wright, *supra* footnote 2, at 25

[52] *See* Wright, *supra* footnote 2, at 27.

62. Zantac became available without a prescription in 1996,[53] and generic versions of the drug (ranitidine) became available the following year.[54] Although sales of brand-name Zantac declined "as a result of generic and alternative products,"[55] Zantac sales have remained strong over time. As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million[56]—a 3.1% increase from the previous year.[57]

63. The rights to Zantac in the U.S. have changed hands several times. In 1996, Zantac was first approved by the FDA for over-the-counter sale. At that time, the over-the-counter version was sold by a joint venture between Glaxo and Warner-Lambert, formed to market Zantac and other over-the-counter drugs.[58] That joint venture ended in 1998, with Warner-Lambert (which was acquired by Pfizer) retaining the right to market Zantac.[59] Defendant Boehringer acquired the U.S. rights to over-the-counter Zantac in late 2006,[60] and manufactured and sold the drug in the United States from approximately January 2007 to January 2017.[61]

---

[53] Wright, *supra* footnote 2, at 28.

[54] David Ranii, *Generic Zantac on market*, NEWS AND OBSERVER (Aug. 5, 1997).

[55] *GlaxoSmithKline – Product Portfolio*, PHARMACEUTICALS COMPANY ANALYSIS (Jan. 21, 2003) (Lexis Advance).

[56] *Leading antacid tablet brands in the United States in 2018*, *supra* footnote 3.

[57] *Sales growth of leading brands of antacid tablets in the United States in 2018 (change to prior sales year)*, STATISTA (last visited Sept. 13, 2019), https://www.statista.com/statistics/194547/us-sales-growth-of-antacid-tablet-brands-in-2013/.

[58] *Business Briefs: Warner-Lambert Increases OTC Stake*, American Health Line (Dec. 20, 1995) (available through Lexis Advance).

[59] *Warner-Lambert/Glaxo: To End Joint Venture*, American Health Line (Aug. 4, 1998) (available through Lexis Advance).

[60] *Boehringer Ingelheim Pharmaceuticals, Inc. Announces Agreement to Acquire Zantac® from Johnson & Johnson and the Pfizer Consumer Healthcare Business*, BUSINESS WIRE (Oct. 12, 2006).

[61] *See Digesting an acquisition: Patrick Hennig, Boehringer Ingelheim; Ingelheim Pharmaceuticals to acquire U.S. rights for Zantac product line; Interview*, DRUG STORE NEWS (Mar. 5, 2007); Mike Pare,

64. The Sanofi Defendants acquired the U.S. rights to over-the-counter Zantac in approximately January 2017 and have since that time been manufacturing and selling the over-the-counter version of the drug in the United States.[62] Since its launch in 1983, Glaxo has and continues to sell the prescription version of Zantac.

3. **Throughout the relevant period, and throughout each period of time each Defendant marketed and sold Zantac, the scientific community continued to raise concerns about NDMA formation from ranitidine.**

65. As set forth above, even before ranitidine's launch, and shortly after its launch, serious questions were raised about the safety of ranitidine. Specifically, questions were raised as to whether ranitidine ingestion can lead to the formation of highly carcinogenic NDMA within the human body. As time went on, the scientific evidence establishing that NDMA is formed from ranitidine, in the body, and in other conditions, continued to pile up.

66. For example, a 2011 scientific study found that, out of eight pharmaceuticals that were observed, "ranitidine showed the strongest potential to form N nitrosodimethylamine (NDMA)" when present in drinking water during chloramine disinfection.[63] The same study noted that "[r]anitidine gave a much higher yield of NDMA in the present study than reported in [prior] literature."[64] On information and belief, the Defendants were aware of this study. Another 2011

---

*Chattem adds Zantac, Dulcolax to portfolio*, CHATTANOOGA TIMES FREE PRESS (TENNESSEE) (Feb. 8, 2017).

[62] *Chattem adds Zantac, supra* footnote 59.

[63] Ruqiao Shen & Susan A. Andrews, *Demonstration of 20 pharmaceuticals and personal care products (PPCPs) as nitrosamine precursors during chloramine disinfection*, 45 WATER RESEARCH 944 (Oct. 13, 2010). "Chloramination is the process of adding chloramine to drinking water to disinfect it and kill germs. Chloramination is sometimes used as an alternative to chlorination." *Disinfection with Chloramine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Jan. 20, 2015), https://www.cdc.gov/healthywater/drinking/public/chloramine-disinfection.html.

[64] *Id.* at 948.

scientific article that examined ranitidine in the water supply also found that the drug was "an important NDMA precursor."[65] On information and belief, the Defendants were aware of this study.

67.     A 2014 scientific article that examined the formation mechanisms of NDMA acknowledged the consensus about the dangers posed by ranitidine, observing that ranitidine and two other pharmaceuticals had "recently caused much concern because they are potent NDMA precursors."[66] On information and belief, the Defendants were aware of this study.

68.     A peer-reviewed study published in the scientific journal *Carcinogenesis* in 2016 "confirmed the production of *N*-nitrosodimethylamine (NDMA), a potent carcinogen, by nitrosation of ranitidine under stomach-relevant pH conditions in vitro" and also showed that, during the 24 hours following ranitidine intake, the quantity of NDMA in urine excreted by the patient "increased 400 folds from 110 to 47 600 ng."[67] The article noted that these levels of NDMA "equaled or exceeded those observed previously in patients with schistosomiasis, a disease wherein N nitrosamines are implicated as the etiological agents for bladder cancer."[68] The article also cautioned that these "estimates are conservative": The actual exposure to NDMA is "likely much higher than that eliminated in urine" since NDMA has "a high metabolic conversion rate" so that

---

[65] Julien Le Roux, et al., *Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation*, 45 WATER RESEARCH 3164 (Mar. 26, 2011).

[66] Yong Dong Liu, et al., *Formation Mechanism of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: A Computational Study*, 48 ENVTL. SCI. & TECHNOLOGY 8653 (June 26, 2014).

[67] Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

[68] *Id.*

only about 0.05% of NDMA in the body is excreted in urine.[69] The authors of the study concluded that "a more comprehensive risk assessment"—such as "[e]pidemiological studies evaluating cancer risk, particularly bladder cancer, attributable to the long term use of ranitidine"— was needed because of "the widespread use of ranitidine."[70] The authors also noted that "alternative medications, such as proton pump inhibitors (PPIs), would less likely promote in vivo nitrosation because of the lack of amines in their structure."[71] On information and belief, the Defendants were aware of this study.

69.     A 2018 scientific review "summariz[ing] major findings over the last decade related to N Nitrosodimethylamine (NDMA)" again pointed out that ranitidine had a high rate of NDMA formation "upon chloramination." On information and belief, the Defendants were aware of this study.

70.     Not only was there a significant amount of scientific literature that continued to pile up establishing NDMA formation from ranitidine, but studies were also published specifically linking Zantac to certain types of cancers in humans. For example, in 2004 an extensive epidemiology study was published specifically linking Zantac use to bladder cancer.[72] In that study, nearly 51,000 health professionals (such as dentists, veterinarians, pharmacists) were studied over nearly 15 years to assess the relationship between peptic ulcer disease and bladder cancer. As part of that study, the study participants' use of $H_2$ blockers (which included both cimetidine and

---

[69] *Id.* at 632.

[70] *Id.* at 632-633.

[71] *Id.*

[72] Dominque S. Michaud, Pauline A. Mysliwiec, Walid Aldoori, Walter C. Willet, and Edward Giovannucci, *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION, Vol. 13 250-254 (Feb. 2004).

Zantac), were monitored. The study's authors noted that for those participants who took either cimetidine or Zantac, "[w]e observed an increase in bladder cancer risk among men who reported taking either of these medications . . . ."[73]

71.     Despite the undeniable scientific evidence linking ranitidine to the production of high levels of NDMA, or the mounting evidence that Zantac itself is linked to cancer, Defendants did not disclose this link to consumers on Zantac's label or through any other means. Since Zantac has been commercially available, by prescription and over-the-counter, the FDA has never been presented with any disclosure by any Defendant, concerning the risk of NDMA formation from ranitidine. Surely, if it had, the FDA would never have approved the drug for use.

**B.     The Dangers of *N*-Nitrosodimethylamine (NDMA)**

72.     "NDMA is a semivolatile organic chemical that forms in both industrial and natural processes. It is a member of N-nitrosamines, a family of potent carcinogens."[74]

73.     The dangers that NDMA poses to human health have long been recognized. A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory

---

[73] *Id.* at 252.

[74] *Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)*, Environmental Protection Agency (Jan. 2014), https://www.epa.gov/sites/production/files/2014-03/documents/ ffrrofactsheet_contaminant_ndma_january2014_final.pdf.

animal tested so far."[75] NDMA is no longer produced or commercially used in the United States,

except for research.[76] In other words, it is only a poison.

74.     Both the EPA and the International Agency for Research on Cancer ("IARC") have

classified NDMA as a probable human carcinogen.[77] And the World Health Organization has

stated that scientific testing indicates that "NDMA consumption is positively associated with either

gastric or colorectal cancer" and "suggests that humans may be especially sensitive to the

carcinogenicity of NDMA."[78]

75.     As early as 1980, consumer products containing unsafe levels of NDMA and other

nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the

FDA.[79]

76.     Most recently, beginning in the summer of 2018, there have been recalls of several

generic drugs used to treat high blood pressure and heart failure—valsartan, losartan, and

---

[75] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL (CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); S.A. Kyrtopoulos, *DNA adducts in humans after exposure to methylating agents*, 405 MUTATION RESEARCH 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumours, including tumours of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

[76] *Technical Fact Sheet*, *supra* footnote 72.

[77] *Technical Fact Sheet*, *supra* footnote 72; World Health Organization, *N-Nitrosodimethylamine (NDMA)*, GUIDELINES FOR DRINKING-WATER QUALITY (3rd ed. 2008) [hereinafter *WHO Guidelines*], *available at* https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.

[78] *WHO Guidelines*, *supra* footnote 77.

[79] *See, e.g.*, Karen De Witt, *Carcinogen Fear Allayed*, THE NEW YORK TIMES (July 2, 1980) (reporting recall of beer that contained higher level of nitrosamines than that permitted by FDA).

irbesartan—because the medications "contain[ed] nitrosamine impurities that don't meet the [FDA's] safety standards,"[80] which provide that the intake of NDMA should be no more than 96 ng.[81] The highest level of NDMA detected by the FDA in any of the valsartan tablets was 20.19 μg (or 20,190 ng) per tablet.[82] In the case of valsartan, the NDMA was an impurity caused by a manufacturing defect, and thus NDMA was present in only *some* valsartan products.

77. Zantac poses a greater safety risk than any of the recently recalled valsartan tablets. Applying the FDA's GC/MS protocols for detecting NDMA—the same protocols used by the FDA to detect NDMA in valsartan[83]—the level of NDMA in Zantac is 2,511,469 ng per Zantac tablet— **124 times** more than the highest amount detected in the recalled valsartan.[84]

78. Moreover, the high levels of NDMA that Zantac produces are not caused by a manufacturing defect but rather are inherent to the molecular structure of ranitidine, the active ingredient in Zantac: "The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are well known to combine to form NDMA."[85] Thus, ranitidine produces

---

[80] *Recalls of Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan and Irbesartan*, FDA (May 23, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/recalls-angiotensin-ii-receptor-blockers-arbs-including-valsartan-losartan-and-irbesartan.

[81] *FDA Updates and Press Announcements*, *supra* footnote 13.

[82] *See Laboratory analysis of valsartan products*, FDA (May 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products.

[83] *Combined N-Nitrosodimethylamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay by GC/MS-Headspace*, FOOD & DRUG ADMINISTRATION (Jan. 25, 2019), https://www.fda.gov/media/117843/download.

[84] *See* Citizen Petition, *supra* footnote 7, at 5; *Combined N-Nitrosodimethylamine*, *supra* footnote 83.

[85] Citizen Petition, *supra* footnote 7, at 19.

NDMA by "react[ing] with itself,"[86] which means that *every dosage and form of ranitidine*, including Zantac, exposes users to NDMA.[87]

79.    NDMA in and of itself is toxic. But, NDMA is not the final harmful metabolite produced from ranitidine. NDMA itself is further metabolized by the body into other harmful compounds. For example, it is well-established that NDMA is metabolized by the body into formaldehyde. Formaldehyde is a *known* carcinogen.[88] IARC classifies something as a known carcinogen when "there is sufficient evidence of carcinogenicity in humans."[89] In addition to IARC's designation of formaldehyde as a known carcinogen, the United States itself has designated formaldehyde as a known carcinogen. In 2014, The National Toxicology Program, a division of the U.S. Department of Health and Human Services, classified formaldehyde as a known human carcinogen.[90] Formaldehyde has been specifically linked to various types of cancers. In fact, in 2009, IARC stated that "there is sufficient evidence for a causal association of formaldehyde with leukemia."[91]

80.    At all times relevant to this complaint, there was never any debate about the toxicity and lethality of NDMA. However, at one time, long ago, much of the literature linking NDMA to cancers, were based on animal studies. And, such studies linked NDMA to carcinogenesis and

---

[86] Citizen Petition, *supra* footnote 7, at 2.

[87] Citizen Petition, *supra* footnote 7, at 1.

[88] https://www.cancer.org/cancer/cancer-causes/formaldehyde.html (last visited Oct. 16, 2019).

[89] https://monographs.iarc.fr/wp-content/uploads/2019/07/Preamble-2019.pdf, at p. 35 (last visited Oct. 14, 2019).

[90] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet#r3 (last visited Oct. 14, 2019).

[91] https://www.atsdr.cdc.gov/toxprofiles/formaldehyde_addendum.pdf, at p. 47 (last visited Oct. 14, 2019).

other adverse health consequences. In one example referenced above, a news article published in 1979 (four years prior to Zantac's launch), noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."

81.     However, more recently, there have been several important studies, including extensive epidemiological studies, which found that NDMA is a causal agent in various types of cancers. For example, one epidemiology study that just was published this year, followed over 30,000 individuals for over 40 years, and who were exposed to NDMA. The study found strong linkages between NDMA exposure and cancer in humans. Thus, much like there was never any debate about how toxic NDMA is, there is now no debate as to its causal connection to cancer *in humans*.

82.     Further, it is also true that nitrosamines like NDMA are found in certain foods in very low amounts. For example, in the FDA's September 13, 2019 release first announcing that it detected NDMA in ranitidine it tested, it stated, "NDMA is a known environmental contaminant and found in water and foods, including meats, dairy products, and vegetables."[92] However, the levels of NDMA formed in the human body as a result of ranitidine ingestion far exceed the amount of NDMA that could *ever* be found in food making NDMA levels in food an inapt comparison to ranitidine.

83.     For example, as set forth above, in 2016, Professors Mitch and Zeng found that in the 24-hour period following ingestion of a single 150 mg tablet of Zantac, an individual can excrete nearly 47,000 ng of NDMA. For comparison, the United States Department of Agriculture

---

[92] https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine (last visited Oct. 15, 2019).

("USDA") has found that cooked cured bacon – commonly thought to be a food with a high level of nitrosomines – has, on average of 0.53 ng of NDMA per gram.[93]

84.   This means that for an individual to be exposed to the same level of NDMA that Mitch and Zeng measured (*i.e.*, 47,000 ng) following ingestion of *a single* 150 mg ranitidine tablet, they would have to consume more than *178 pounds* of bacon within 24 hours. Of course, such exposure through bacon consumption would be impossible – as other, more acute, health concerns would be experienced by an individual attempting to consume that quantity of food in such a short time.

85.   The Mitch and Zeng study, however, as pointed out above, underestimated the level of NDMA exposure experienced by patients in the study – the authors state that only approximately 0.05% (*i.e.*, one two thousandth) of NDMA is excreted through urine, with this being metabolized into other compounds. Thus, in reality, one would have to consume thousands of pounds of bacon to reach the same levels of NDMA found in a *single* Zantac tablet.

86.   The NDMA levels associated with Zantac, pose an extreme risk to cancer in humans. In the FDA's press releases related to the various angiotensin receptor blocker recalls, the FDA modeled some cancer risks associated with the amount of NDMA found in the ARB medications. For example, the FDA stated, "FDA scientists estimate that if 8,000 people took the highest valsartan dose (320 mg) from the recalled batches daily for the full four years, there may be one additional case of cancer over the lifetimes of these 8,000 people."[94] As stated above, the

---

[93] *See* https://www.fsis.usda.gov/wps/wcm/connect/25a03ca6-cdce-4e56-bfca-b634cc7abbef/nitrosamine-risk-assessment.pdf?MOD=AJPERES at Table 2.

[94] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan (last visited Oct. 16, 2019).

highest level of NDMA detected with respect to the ARB medicines was 20,190 ng. Given that

NDMA levels in urine of those in the Mitch and Zeng Study who took Zantac was 47,000 ng, and

that amount likely represents only 0.5% of the amount of NDMA formed in the body from a

Zantac tablet, using the FDA's calculations, the cancer risks of those who take Zantac are *well* below

1 in 4000.

**C.      Defendants did not disclose to Plaintiffs, the FDA or anyone else that Zantac exposes
users to high levels of the carcinogen NDMA, despite having actual or constructive
knowledge of this fact.**

87.     During the time that Defendants manufactured and sold over-the-counter Zantac in

the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe

levels of NDMA. At no time did any Defendant ever disclose this risk to consumers on the drug's

label, or through any other means, nor did Defendants report these risks to the FDA. Further, no

Defendant presented to the FDA a proposed label disclosing the risks for NDMA formation from

ranitidine, and therefore, the FDA never ruled upon any proposed label disclosing the NDMA

risk.

**D.      Most global health regulators, and manufacturers themselves, have recalled their Zantac
and ranitidine products.**

88.     Since the filing of the Valisure's Citizen Petition on September 13, 2019, virtually

every health regulator throughout the world, with the exception of the U.S. FDA, has taken steps

to remove Zantac and ranitidine from the marketplace. In addition, many manufacturers,

including the Glaxo and Sanofi Defendants, have also recalled the drug.

89.     At the request of Health Canada, the department of the Canadian government

responsible for national public health, "companies marketing ranitidine products in Canada have

stopped any further distribution until evidence is provided to demonstrate that they do not

contain NDMA above acceptable levels."[95] According to Canadian regulators, "[c]urrent evidence suggests that NDMA may be present in ranitidine, regardless of the manufacturer."[96]

90.      Similarly, South Korea's Ministry of Food and Drug Safety has stated that "[i]t suspects NDMA may have been unintentionally produced *in the course of natural decomposition and synthesis reactions of the nitrite and dimethylamine chemicals in ranitidine* or by dimethylamine accidentally being added during the manufacturing process."[97]

91.      Germany, Switzerland, and Austria all have initiated recalls of ranitidine-based drugs,[98] and Finland has withdrawn drugs containing ranitidine from its pharmacies.[99] Singapore has suspended the sale and supply of several brands of ranitidine.[100] Qatar's Ministry of Public Health "has withdrawn samples of ranitidine, including the one commercially known as Zantac, from public and private pharmacies" and has "recommend[ed] patients who use these drugs to

---

[95] *Information Update – Health Canada requests that companies stop distributing ranitidine drugs in Canada while it assesses NDMA; some products being recalled*, CISION CANADA (Sept. 17, 2019), https://www.newswire.ca/news-releases/information-update-health-canada-requests-that-companies-stop-distributing-ranitidine-drugs-in-canada-while-it-assesses-ndma-some-products-being-recalled-821911993.html.

[96] *Id.*

[97] *Korea bans sales of Zantac and other ranitidine drugs after carcinogen alert*, Pulse (Sept. 26, 2019), https://m.pulsenews.co.kr/view.php?year=2019&no=769561.

[98] Tom Gallen, *Ranitidine Recalls Begin In Europe As Regulators Take Action*, PHARMA INTELLIGENCE (Sept. 18, 2019), https://hbw.pharmaintelligence.informa.com/RS149219/Ranitidine-Recalls-Begin-In-Europe-As-Regulators-Take-Action.

[99] *Pharmacies pull heartburn meds over contamination concerns*, UUTISET (Sept. 19, 2019), https://yle.fi/uutiset/osasto/news/pharmacies_pull_heartburn_meds_over_contamination_concerns/10977530.

[100] *Singapore halts sales of some antacids over stomach cancer concerns*, SOUTH CHINA MORNING POST (Sept. 16, 2019), https://www.scmp.com/news/asia/southeast-asia/article/3027521/singapore-halts-sales-some-antacids-over-stomach-cancer.

review and consult their doctor, and those who use them without a prescription should use other alternatives."[101] In addition to these countries, the following countries have either issued recalls, medical alerts, announced an investigation, or companies voluntarily recalled their Zantac and/or generic ranitidine:

- Australia
- Bangladesh
- Bahrain
- Cyprus
- Denmark
- Egypt
- France
- Greece
- Hong Kong
- India
- Ireland
- Jamaica
- Kenya
- Kuwait
- Italy
- Japan
- Libya
- Lithuania
- Morocco
- New Zealand
- Namibia
- Norway
- Oman
- Palestine
- Pakistan
- Saudi Arabia
- South Africa
- Suriname
- Taiwan
- Trinidad and Tobago
- UAE
- UK

---

[101] *Health ministry recalls Zantac as a precautionary measure*, QATAR TRIBUNE (Sept. 16, 2019), http://www.qatar-tribune.com/news-details/id/172460.

- Vietnam[102]

92.     Some companies that manufacture and distribute Zantac and generic ranitidine also have taken action to protect consumers. Most recently, on October 18, 2019, Zantac's current manufacturer, Defendant Sanofi, issued a recall of its Zantac in the U.S. and Canada.[103] In its release announcing the recall, Sanofi stated that "Due to inconsistencies in preliminary test results of the active ingredient used in the U.S. and Canadian products, Sanofi has made the decision to conduct the voluntary recall in the U.S. and Canada as the investigation continues."[104] On October 9, 2019, Defendant Glaxo announced that it was pulling its Zantac product from the marketplace worldwide.[105] Sandoz, a unit of Novartis AG, has stopped its "worldwide distribution of generic versions" of Zantac.[106] And Dr. Reddy's Laboratories Limited has suspended its supply of generic Zantac (ranitidine) worldwide.[107]

93.     Other large pharmacies in the U.S. have also pulled Zantac and generic equivalents from their shelves. On September 30, 2019, pharmacy giants CVS, Walgreens, and Rite-Aid

---

[102] https://www.valisure.com/blog/uncategorized/detection-of-ndma-in-raniditine/ (last visited Oct. 25, 2019).

[103] https://www.usatoday.com/story/news/health/2019/10/18/sanofi-recalls-heartburn-drug-zantac-investigate-carcinogen/4021833002/ (last visited Oct. 18, 2019).

[104] *Id.*

[105] https://www.fiercepharma.com/manufacturing/gsk-joins-other-drugmakers-recalling-zantac-products.

[106] Anna Edney, *Carcinogen Scare Sets Off Global Race to Contain Tainted Zantac*, BLOOMBERG (Sept. 18, 2019), https://www.bloomberg.com/news/articles/2019-09-18/sandoz-halts-distribution-of-zantac-after-carcinogen-concerns.

[107] *Dr Reddy tumbles on buzz of halting worldwide supply of Ranitidine*, BUSINESS STANDARD (Sept. 23, 2019), https://www.business-standard.com/article/news-cm/dr-reddy-tumbles-on-buzz-of-halting-worldwide-supply-of-ranitidine-119092300347_1.html.

announced they were pulling Zantac and generic ranitidine from their shelves.[108] Walmart also announced that it was pulling the drug from its shelves.[109]

94.     Reading this complaint, one might ask: How did this happen? Why was this drug, which has been taken by millions, allowed to be sold? The answer is that the United States drug regulatory system is largely, if not entirely, reliant on the drug manufacturers themselves to perform adequate testing and report adverse events.

95.     Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

96.     Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety:

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.[110]

97.     The manufacturer's annual report also must contain "[c]opies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in

---

[108] https://www.washingtonpost.com/health/2019/09/30/drugstores-are-pulling-zantac-like-heartburn-drugs-off-shelves-over-potential-cancer-risk/.

[109] https://www.cnn.com/2019/09/30/health/cvs-zantac-pulled-cancer-trnd/index.html.

[110] 21 C.F.R. § 314.81(b)(2).

vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product."[111]

98.     Defendants simply ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac. Further, the FDA simply doesn't have the resources to police and enforce this provision.

99.     Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

### A.     Discovery-Rule Tolling

100.     Within the period of any applicable statutes of limitation, Plaintiffs could not have discovered through the exercise of reasonable diligence that high levels of the carcinogen NDMA was produced by Zantac ingestion.

101.     Plaintiffs did not discover, and did not know of, facts that would have caused a reasonable person to suspect that their injuries were caused by Defendants' concealment of the fact that high levels of the carcinogen NDMA were produced by Zantac. The information linking Zantac to NDMA was contained exclusively in articles that were published in scientific journals. Plaintiffs did not have access to these scientific articles because they were behind a paywall. And even had the articles been more widely available, the significance of these highly technical articles would not have been apparent to Plaintiffs.

---

[111] 21 C.F.R. § 314.81(b)(2)(v).

102.    Plaintiffs could not have reasonably discovered the true extent of Defendants' deception about Zantac's safety until Valisure filed its Citizen Petition disclosing the extremely high levels of NDMA produced by Zantac.

103.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.      Fraudulent-Concealment Tolling**

104.    All applicable statutes of limitation have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action of Zantac's producing high levels of the carcinogen NDMA.

105.    Instead of disclosing to consumers the link between Zantac and the carcinogen NDMA, Defendants continued to manufacture and sell Zantac without disclosing this information on the drug's label or elsewhere. Further, Defendants misled the public into believing Zantac was safe by repeatedly touting the safety of Zantac. Indeed, until the day it issued its recall, Defendant Sanofi still claimed that "longstanding science supports the safety of Zantac."[112]

**C.      Estoppel**

106.    Defendants were under a continuous duty to disclose to Plaintiffs the risk of NDMA exposure associated with Zantac.

107.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of NDMA exposure associated with Zantac and never updated the drug's label to disclose this risk.

---

[112] https://www.zantacotc.com/ (last visited Oct. 16, 2019).

108.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**D.      Continuing Tort**

109.    The continuing tort doctrine applies when there is a repeated or continuous injury and the tort is not completed until the last injury is inflicted or the wrongdoing ceases. In cases of continuing torts, the statutes of limitations do not begin to run until the date of the last tortious act.

110.    The Plaintiffs used Zantac over extended periods. Each time a Plaintiff ingested Zantac, it constituted a continuing tort.

111.    The time period associated with the Plaintiffs' statute of limitations did not begin to run until, at the earliest, the Plaintiffs' last use of Zantac.

## VI.     CLAIMS FOR RELIEF

### COUNT I

### STRICT PRODUCTS LIABILITY – DESIGN DEFECT

112.    This Count is asserted by the following Plaintiffs as follows: Plaintiff George Cravens brings this claim against Defendant Boehringer under Oklahoma law; Plaintiff Venus Sykes brings this claim against Defendant Boehringer under Illinois law; Plaintiff Jarquisha Harris brings this claim against Defendant Boehringer under Wisconsin law; Plaintiff Ronald Maranto brings this claim against Defendant Boehringer under Maryland law; Plaintiff Scott Moser brings this claim against Defendant Boehringer under Texas law; and Plaintiff Donald Boland brings this claim against Defendant Boehringer under Florida law. For purposes of this Count, these plaintiffs shall be referred to collectively as "Plaintiffs."

113.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

114.    The Defendants manufactured, marketed, and sold Zantac during the periods set forth above.

115.    The Zantac manufactured and sold by Defendants reached Plaintiffs without substantial change to the condition in which they were sold.

116.    Zantac is unreasonably dangerous and unsafe for its intended purpose because, when ingested, it forms extremely high levels of NDMA and other harmful metabolites in the body. NDMA is a human carcinogen associated with various types of cancers. Indeed, the chemical structure of ranitidine itself is inherently unstable and contains the two chemical precursors to the formation of NDMA: a nitrite group and a dimethylamine (DMA) group.

117.    Zantac's design defect existed at the time Zantac left the Defendants' possession.

118.    Zantac is not as safe as current technology could make it, nor is it as safe as then-current technology could make it. Indeed, there are several other classes of drugs that treat the same condition, such as proton-pump inhibitors, which don't metabolize into NDMA when ingested.

119.    The risks of NDMA formation in the human body from Zantac ingestion, and the concomitant risk of cancers associated with NDMA, were known to and foreseeable to all Defendants at all times during the period which they manufactured and sold Zantac. Even before Zantac was commercially launched in 1983 in the United States, as further described above, the scientific community expressed concern about the propensity of ranitidine to form NDMA in the body when ingested. Further, from the time of Zantac's launch until the present day, various

scientific literature, as further described in this complaint, expressed concerns about NDMA formation from ranitidine. Plaintiffs were unaware of this scientific literature, but Defendants were aware of it.

120.     The Defendants could have reduced or prevented the foreseeable risks of harm associated with Zantac by adopting a reasonable and feasible alternative design.

121.     The likelihood and severity of the cancers suffered by patients like Plaintiffs far outweighed the Defendants' burden in taking safety measures to reduce or avoid the harm. Given the sheer number of people taking Zantac, including over the long-term, there was a high likelihood that Zantac would injure a very large number of patients, by causing cancer in such patients, which would be severely detrimental to one's health and could result in death.

122.     The Defendants knew that ordinary patients would use Zantac without knowledge of the hazards involved in such use. Zantac failed to perform as an ordinary consumer would expect in that it produced hazardous amounts of NDMA and other harmful metabolites when ingested in the body.

123.     The Defendants knowingly designed Zantac with the design defect that causes Zantac to form NDMA in the body when ingested, to maximize profits.

124.     Zantac was approved by the FDA in 1983 pursuant to New Drug Application 0180703. Following the filing of NDA 0180703, there were numerous other NDAs filed by the Defendants, including, but not limited to, NDA Nos. 019090 (Glaxo Zantac injection), 019675 (Glaxo Zantac syrup), 020095 (Glaxo Zantac 150 capsule), 020251 (Glaxo Zantac effervescent 150), 021698 (Sanofi Zantac 150), 0200095 (Glaxo Zantac 300 tablet), 020520 (Sanofi Zantac 75 tablet), and 020745 (Sanofi Zantac 75 effervescent). In connection with each of these NDAs, the relevant

Defendant which filed such NDA could have submitted an alternative or different formulation for Zantac, one in which Zantac wouldn't metabolize into NDMA and other harmful metabolites. But, no Defendant did so, instead, continuing to utilize the defective design of ranitidine, which caused the formation of NDMA and other harmful metabolites in the body upon ingestion.

125.    The benefit in promoting enhanced accountability through strict products liability outweighs the benefit of a product that the Defendants should have and could have made safer years earlier.

126.    Had Plaintiffs known of the defect in Zantac, they would not have taken Zantac. Instead, they would have taken a safer alternative to Zantac that wouldn't expose them to harmful levels of NDMA and other dangerous metabolites.

127.    Plaintiffs ingested Zantac for an approved purpose and experienced cancers as a result of their Zantac use.

128.    Plaintiffs' cancer injuries were directly and proximately caused by Zantac while Plaintiffs used Zantac in a reasonably foreseeable manner.

<u>COUNT II</u>

**STRICT PRODUCTS LIABILITY – FAILURE TO WARN**

129.    This Count is asserted by the following Plaintiffs as follows: Plaintiff George Cravens brings this claim against Defendant Boehringer under Oklahoma law; Plaintiff Venus Sykes brings this claim against Defendant Boehringer under Illinois law; Plaintiff Jarquisha Harris brings this claim against Defendant Boehringer under Wisconsin law; Plaintiff Ronald Maranto brings this claim against Defendant Boehringer under Maryland law; Plaintiff Scott Moser brings this claim against Defendant Boehringer under Texas law; Plaintiff Donald Boland brings this claim against Defendant Boehringer under Florida law; and Plaintiff Fernando Zaragoza brings this

claim against Defendant Boehringer under California law. For purposes of this Count, these plaintiffs shall be referred to collectively as "Plaintiffs."

130.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

131.    The Defendants are manufacturers and sellers of Zantac.

132.    The Defendants were aware of the risks that Zantac posed to those who ingested it, and the risks Zantac posed to those who used it were knowable at the time the Defendants manufactured, sold, or distributed Zantac. Indeed, at the time the Defendants manufactured and sold Zantac, the scientific community had already identified the dangers of NDMA formation in ranitidine.

133.    The risk that NDMA would form in the human body as a result of Zantac ingestion, and the associated development of Plaintiffs' cancers, were known or knowable in light of the scientific and medical knowledge available at the time of manufacture and distribution of Zantac. At all times since Zantac was commercially sold in the U.S., the Defendants knew that ranitidine would form into NDMA in the body, and that NDMA was a carcinogen.

134.    Zantac posed a substantial danger to patients' bodies because NDMA forms in high quantities in the human body as a result of Zantac ingestion. Further, NDMA itself metabolizes into other harmful compounds including, but not limited to, formaldehyde, a known human carcinogen and known to cause leukemia.

135.    Ordinary consumers and physicians would not have recognized, and did not recognize the risks Zantac posed to patients.

136.    The Defendants failed to adequately warn Plaintiffs and Plaintiffs' physicians about the risks that Zantac posed to patients.

137.    The Defendants never warned the FDA, those who took Zantac, or the scientific and medical communities, that NDMA forms in high quantities when ingested in the human body, and that NDMA leads to cancers in animals and humans.

138.    Plaintiffs were injured by using Zantac in a reasonably foreseeable way.

139.    The lack of adequate warnings and instructions was a substantial factor in causing Plaintiffs' injuries.

140.    Had Defendants adequately warned and instructed Plaintiffs, Plaintiffs would not have taken Zantac, and would not have developed the cancers they are or have been afflicted with. Instead, Plaintiffs would have taken an alternative drug to Zantac, that would not have exposed the Plaintiffs to harmful levels of NDMA and other dangerous metabolites.

141.    Plaintiffs' cancer-related injuries were directly and proximately caused by Defendants' inadequate warnings.

**COUNT III**

**CONNECTICUT PRODUCTS LIABILITY ACT,
CONN. GEN. STAT. § 52-572N *ET SEQ.***

142.    This Count is brought on behalf of Plaintiff Kileen D. Gromelski against all Defendants. Plaintiff realleges and incorporates the allegations made above as if fully set forth below, including, but not limited to, the allegations specifically contained in the paragraphs corresponding to Counts I and II above.

143.    The Defendants sold or otherwise put Zantac into the stream of commerce in a defective condition unreasonably dangerous to ordinary users like the Plaintiff.

– 47 –

144.     Zantac is defective in design and Defendants failed to adequately warn about the dangers and proper use of Zantac.

145.     The Plaintiff is in the class of persons who are ordinary consumers who purchased Zantac, with the ordinary knowledge common to the community about the products' characteristics.

146.     The Defendants are in the business of selling pharmaceuticals like Zantac.

147.     Zantac was expected to, and did, reach users like the Plaintiff without substantial alteration in the condition in which the Defendants manufactured them and sold them.

148.     At the time Zantac left Defendants' control, Zantac was in a defective condition not contemplated by reasonable persons among those considered expected users or consumers of the products, and that will be unreasonably dangerous to the expected, ultimate user or consumer when used in reasonably expected ways of handling or consumption. Zantac is dangerous to an extent beyond which would be contemplated by the ordinary user and consumer, with ordinary knowledge common to the community as to the product's characteristics.

149.     The defective condition of Zantac rendered Zantac unreasonably dangerous to ultimate users like Plaintiff.

150.     Zantac is defective because the Defendants failed to properly and adequately label Zantac to give reasonable warnings of the danger about Zantac or give reasonably complete instructions on the proper use of the product. If such warnings were provided, the harm would have been avoided.

151.    The Defendants failed to exercise reasonable care under the circumstances in designing Zantac and in providing warnings or instructions regarding the dangerous propensities of Zantac.

152.    At the time Zantac left Defendants' control, the risks of the Plaintiff developing cancers from Zantac use were known or reasonably foreseeable to Defendants.

153.    At the time Zantac left the Defendants' control, the inherent, foreseeable, and known risks associated with the design exceeded the benefits of the design.

154.    Zantac was approved by the FDA in 1983 pursuant to New Drug Application 0180703. Following the filing of NDA 0180703, there were numerous other NDAs filed by the Defendants, including, but not limited to, NDA Nos. 019090 (Glaxo Zantac injection), 019675 (Glaxo Zantac syrup), 020095 (Glaxo Zantac 150 capsule), 020251 (Glaxo Zantac effervescent 150), 021698 (Sanofi Zantac 150), 0200095 (Glaxo Zantac 300 tablet), 020520 (Sanofi Zantac 75 tablet), and 020745 (Sanofi Zantac 75 effervescent). In connection with each of these NDAs, the relevant Defendant that filed such NDA could have submitted an alternative or different formulation for Zantac, one in which Zantac wouldn't metabolize into NDMA and other harmful metabolites. But, no Defendant did so, instead, continuing to utilize the defective design of ranitidine which caused the formation of NDMA and other harmful metabolites in the body upon ingestion.

155.    The defective and unreasonably dangerous condition of Zantac proximately caused the Plaintiff's physical injuries for which recovery is sought.

156.    The Defendants acted with reckless disregard for the rights and safety of the Plaintiff and acted with intentional and wanton violation of those rights. The Plaintiff seeks punitive damages for injuries caused by the Defendants' wanton and malicious conduct.

## COUNT IV

### NEW JERSEY PRODUCTS LIABILITY ACT
### N.J. STAT. §§ 2A:58C-1 *ET SEQ.*

157.    This Count is brought on behalf of Plaintiff Michael DeLuccia against Defendant

Boehringer and by Plaintiff Paul Burpulis against Defendant Boehringer. For purposes of this

Count, Plaintiffs DeLuccia and Burpulis shall be referred to collectively as "Plaintiffs." The

Plaintiffs reallege and incorporate the allegations made above as if fully set forth below, including,

but not limited to, the allegations specifically contained in the paragraphs corresponding to

Counts I and II above.

158.    Zantac is not reasonably fit, suitable or safe for its intended purpose because the

Defendants designed Zantac in a defective manner and failed to give adequate warnings or

instructions at the time Zantac left the Defendants' control and after that.

159.    At the time Zantac left the Defendants' control, there was a practical and

technically feasible alternative design that would have prevented the harm without substantially

impairing the reasonably anticipated or intended function of Zantac.

160.    Zantac is not unavoidably unsafe and the harm was not caused by an unavoidably

unsafe aspect of Zantac.

161.    Zantac was approved by the FDA in 1983 pursuant to New Drug Application

0180703. Following the filing of NDA 0180703, there were numerous other NDAs filed by the

Defendants, including, but not limited to, NDA Nos. 019090 (Glaxo Zantac injection), 019675

(Glaxo Zantac syrup), 020095 (Glaxo Zantac 150 capsule), 020251 (Glaxo Zantac effervescent 150),

021698 (Sanofi Zantac 150), 0200095 (Glaxo Zantac 300 tablet), 020520 (Sanofi Zantac 75 tablet),

and 020745 (Sanofi Zantac 75 effervescent). In connection with each of these NDAs, the relevant

Defendant that filed such NDA could have submitted an alternative or different formulation for Zantac, one in which Zantac wouldn't metabolize into NDMA and other harmful metabolites. But, no Defendant did so, instead, continuing to utilize the defective design of ranitidine, which caused the formation of NDMA and other harmful metabolites in the body upon ingestion.

162.    The Defendants failed to provide any warnings of the dangers regarding the fact that NDMA and other harmful metabolites form in the body following ingestion of Zantac.

163.    The defective and unreasonably dangerous condition of Zantac proximately caused the Plaintiffs' injuries and damages for which recovery is sought.

## COUNT V

## NEGLIGENCE AND GROSS NEGLIGENCE

164.    This Count is asserted by the following Plaintiffs as follows: Plaintiff George Cravens brings this claim against Defendant Boehringer under Oklahoma law; Plaintiff Kileen D. Gromelski brings this claim against all Defendants under Connecticut law; Plaintiff Venus Sykes brings this claim against Defendant Boehringer under Illinois law; Plaintiff Jarquisha Harris brings this claim against Defendant Boehringer under Wisconsin law; Plaintiff Ronald Maranto brings this claim against Defendant Boehringer under Maryland law; Plaintiff Scott Moser brings this claim against Defendant Boehringer under Texas law; Plaintiff Donald Boland brings this claim against Defendant Boehringer under Florida law; Plaintiff Michael DeLuccia brings this claim against Defendant Boehringer under New Jersey law; Plaintiff Paul Burpulis brings this claim against Defendant Boehringer under New Jersey law; and Plaintiff Fernando Zaragoza brings this claim against Defendant Boehringer under California law. For purposes of this Count, these plaintiffs shall be referred to collectively as "Plaintiffs."

165.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

166.    The Defendants had a duty to exercise ordinary care in the design, manufacture, marketing, and sale of their pharmaceutical products, including Zantac.

167.    The Defendants had a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that their pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

168.    The Defendants have a duty to monitor the adverse effects associated with their pharmaceutical products, including Zantac.

169.    The Defendants have a continuing duty to warn of the adverse effects associated with their pharmaceutical products, including Zantac, to avoid reasonably foreseeable risks.

170.    The Defendants had a duty to exercise reasonable care when they undertake affirmative acts for the protection of others.

171.    The Defendants owed these duties to Plaintiffs because it was foreseeable to each Defendant that patients like Plaintiffs would ingest and consequently be endangered by Zantac.

172.    The Defendants knew that Zantac was likely to form NDMA within the human body in high quantities due to the inherent instability of the ranitidine molecule, and as a result of such NDMA formation, Zantac users would be exposed to unreasonable risks of cancer. The Defendants' knowledge that NDMA would be formed within the human body as a result of Zantac usage, only grew with each year Zantac was on the market.

173.    The Defendants knew that the ranitidine molecule would likely break down into NDMA and other harmful metabolites in the body, before Zantac was first approved by the FDA.

Despite knowing that Zantac would cause these dangers in humans, the Defendants nonetheless proceeded with the design of the ranitidine molecule into Zantac.

174.    Based, among other things, on their duty to monitor the adverse effects associated with Zantac, the Defendants knew that the likelihood and severity of the harm associated with Zantac usage was great. At least thousands of patients who took Zantac, including Plaintiffs, experienced cancers proximately caused by Zantac use, or have been exposed to an unreasonable risk of developing cancer. The likelihood and severity of the cancers suffered by Plaintiffs and other users of Zantac far outweighed the Defendants' burden in taking safety measures to reduce or avoid the harm.

175.    The Defendants failed to exercise ordinary care in the design, manufacture, and sale of Zantac.

176.    The Defendants failed to use the amount of care in designing Zantac that a reasonably careful manufacturer would have used to avoid exposing patients to foreseeable risks of harm.

177.    The Defendants failed to use the amount of care in warning about the risks and safe use of Zantac that a reasonably careful manufacturer would have used to avoid exposing patients to foreseeable risks of harm.

178.    The Defendants knew or reasonably should have known that Zantac was dangerous or likely to be dangerous when used in a reasonably foreseeable manner.

179.    The Defendants knew or reasonably should have known that Plaintiffs and Plaintiffs' physicians would not realize the danger posed by Zantac.

180.     A reasonable manufacturer and seller under the same or similar circumstances would have instructed Plaintiffs and Plaintiffs' physicians on the safe use of Zantac.

181.     The Defendants' failure to adequately warn Plaintiffs and Plaintiffs' doctors about the dangers of Zantac was compounded by the Defendants' omissions to doctors during sales detailing and other promotional activities.

182.     Plaintiffs were injured by using Zantac in a reasonably foreseeable way.

183.     The lack of adequate warnings was a substantial factor in causing Plaintiffs' injuries.

184.     Had the Defendants adequately warned Plaintiffs' doctors, Plaintiffs' doctors would have read and heeded such warnings. Namely, they would not have prescribed Zantac, or recommended Zantac, to their patients.

185.     Plaintiffs were injured as a direct and proximate result of the Defendants' negligence.

186.     The Defendants' conduct constitutes gross negligence and willful misconduct.

187.     By designing Zantac such that it formed NDMA and other harmful metabolites in the human body following ingestion, when they knew that Zantac acted this way and knew about the harmful effects of NDMA, and by intentionally withholding a safer design of Zantac, while failing to warn (let alone adequately warn) of the known risks of Zantac, the Defendants acted in reckless disregard of, or with a lack of substantial concern for, the rights of others.

188.     The Defendants intentionally designed Zantac in the way that they did, and withheld the safer designs from patients while in disregard of the known risk of NDMA formation from Zantac usage, making it highly probable that harm would result.

189.     The Defendants knew that their conduct would harm Plaintiffs, but chose to withhold any warning to Plaintiffs, or to utilize a safer design for Zantac, simply to make more money for themselves.

## COUNT VI

## BATTERY

190.     This Count is asserted by the following Plaintiffs as follows: Plaintiff George Cravens brings this claim against Defendant Boehringer under Oklahoma law; Plaintiff Kileen D. Gromelski brings this claim against all Defendants under Connecticut law; Plaintiff Venus Sykes brings this claim against Defendant Boehringer under Illinois law; Plaintiff Jarquisha Harris brings this claim against Defendant Boehringer under Wisconsin law; Plaintiff Ronald Maranto brings this claim against Defendant Boehringer under Maryland law; Plaintiff Scott Moser brings this claim against Defendant Boehringer under Texas law; Plaintiff Donald Boland brings this claim against Defendant Boehringer under Florida law; Plaintiff Michael DeLuccia brings this claim against Defendant Boehringer under New Jersey law; Plaintiff Paul Burpulis brings this claim against Defendant Boehringer under New Jersey law; and Plaintiff Fernando Zaragoza brings this claim against Defendant Boehringer under California law. For purposes of this Count, these plaintiffs shall be referred to collectively as "Plaintiffs."

191.     Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

192.     Since Glaxo invented ranitidine, and as fully set forth above, each Defendant knew that when ingested, Zantac metabolizes and forms high levels of NDMA in the body. During the period of time each Defendant sold Zantac, it knew Zantac formed excessive levels of NDMA in the body.

193.     Decades before Zantac was first commercially sold in the United States in 1983, Glaxo knew that NDMA was carcinogenic. Each Defendant thereafter also knew, at the time they sold Zantac, that NDMA was a potent carcinogen.

194.     At the time each Defendant manufactured and sold Zantac, it manufactured and sold Zantac for the express purpose of being used by unwitting consumers, who did not know that when ingested, Zantac formed excessive levels of NDMA in the body. Therefore, at all relevant times, the Defendants knew that was certain or substantially certain that the Plaintiffs would be subjected to excessive levels of NDMA upon ingestion of Zantac, which they manufactured and sold.

195.     Each Plaintiff ingested Zantac, and, as a result, was exposed to excessive amounts of a potent carcinogen – NDMA. The Plaintiffs' exposure to NDMA was caused directly by Defendants.

196.     No reasonable person would want to be subjected to excessive levels of a potent carcinogen, and thus, the Plaintiffs' exposure to NDMA constituted an offensive contact caused by Defendants.

197.     Although each Plaintiff voluntarily ingested Zantac, at no time did any Plaintiff know that Zantac ingestion resulted in the formation of excessive levels of NDMA in the body. If Plaintiffs had known this, they would not have taken Zantac. Therefore, Plaintiffs never consented, implicitly or explicitly, to ingesting a substance that would cause large amounts of NDMA to be formed in their bodies.

198.     The Defendants' battery upon the Plaintiffs proximately caused their injuries and damages for which recovery is sought.

<u>COUNT VII</u>

**FRAUD BY OMISSION**

199.    This Count is asserted by the following Plaintiffs as follows: Plaintiff George Cravens brings this claim against Defendant Boehringer under Oklahoma law; Plaintiff Kileen D. Gromelski brings this claim against all Defendants under Connecticut law; Plaintiff Venus Sykes brings this claim against Defendant Boehringer under Illinois law; Plaintiff Jarquisha Harris brings this claim against Defendant Boehringer under Wisconsin law; Plaintiff Ronald Maranto brings this claim against Defendant Boehringer under Maryland law; Plaintiff Scott Moser brings this claim against Defendant Boehringer under Texas law; Plaintiff Donald Boland brings this claim against Defendant Boehringer under Florida law; Plaintiff Michael DeLuccia brings this claim against Defendant Boehringer under New Jersey law; Plaintiff Paul Burpulis brings this claim against Defendant Boehringer under New Jersey law; and Plaintiff Fernando Zaragoza brings this claim against Defendant Boehringer under California law. For purposes of this Count, these plaintiffs shall be referred to collectively as "Plaintiffs."

200.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

201.    At all times, the Defendants had a duty to exercise ordinary care in the design, manufacture, marketing, and sale of its pharmaceutical products, including Zantac.

202.    The Defendants have a duty to refrain from selling unreasonably dangerous products, including the duty to ensure that their pharmaceutical products do not cause patients to suffer from foreseeable risks of harm.

203.    The Defendants had a duty to monitor the adverse effects associated with pharmaceutical products, including Zantac.

204.    The Defendants have a duty to exercise reasonable care when they undertake affirmative acts for the protection of others.

205.    The Defendants owe these duties to Plaintiffs because it was foreseeable to Defendants that patients like Plaintiffs would ingest and consequently be endangered by Zantac.

206.    The Defendants also owed a duty to speak because they were in possession of information about Zantac that was not readily available to Plaintiffs and Plaintiffs' physicians, made misrepresentations about the safety of Zantac to Plaintiffs and Plaintiffs' physicians while suppressing material facts, and actively concealed material information about Zantac from Plaintiffs and Plaintiffs' physicians, including that when ingested, Zantac formed high levels of NDMA and other dangerous and carcinogenic metabolites in the human body.

207.    The Defendants knew that this information was not readily available to Plaintiffs and their doctors, and Plaintiffs and their doctors did not have an equal opportunity to discover the truth. Plaintiffs and their doctors had no practicable way of discovering the true state and timing of the Defendants' knowledge.

208.    The Defendants intentionally omitted from their prescriber and patient labeling any type of warning alerting patients and their physicians that when ingested, Zantac forms high levels of NDMA and other harmful metabolites in the body. And, given that Defendants advertised and promoted Zantac as being safe, the Defendants had a duty to speak and reveal the fact that they knew when ingested, Zantac formed NDMA and other harmful metabolites in the body.

209.    Plaintiffs and their doctors justifiably relied on the Defendants' product labeling and other representations.

210.    Had the Defendants not omitted this information about the safe use of their drugs from the prescriber and patient labeling, doctors would not have prescribed (or recommended), and patients would not have insisted upon or taken Zantac. But for the Defendants' omissions, Plaintiffs would not have consumed Zantac.

211.    If Plaintiffs had been properly warned about the dangers of Zantac use, they would not have taken Zantac, and would not have developed their injuries, or been at risk for developing cancer from Zantac usage.

212.    Plaintiffs and their doctors justifiably relied on the Defendants' omissions regarding Zantac.

213.    Had the Defendants disclosed that they were aware of, but intentionally withheld, that Zantac forms NDMA and other harmful metabolites in the body once ingested, Plaintiffs would not have ingested Zantac.

214.    Plaintiffs were injured as a direct and proximate result of Defendants' material omissions.

<u>COUNT VIII</u>

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

215.    This Count is asserted by the following Plaintiffs as follows: Plaintiff George Cravens brings this claim against Defendant Boehringer under Oklahoma law; Plaintiff Venus Sykes brings this claim against Defendant Boehringer under Illinois law; Plaintiff Ronald Maranto brings this claim against Defendant Boehringer under Maryland law; Plaintiff Michael DeLuccia brings this claim against Defendant Boehringer under New Jersey law; Plaintiff Paul Burpulis brings this claim against Defendant Boehringer under New Jersey law; and Plaintiff Scott Moser

brings this claim against Defendant Boehringer under Texas law. For purposes of this Count, these plaintiffs shall be referred to collectively as "Plaintiffs."

216. Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

217. The Defendants are or were manufacturers and sellers of Zantac.

218. An implied warranty of fitness for human consumption runs from each Defendant to consumers like Plaintiffs.

219. The Defendants impliedly warranted to Plaintiffs and their doctors that the Zantac they sold were of merchantable quality, and fit and safe for the use for which they were intended.

220. Plaintiffs ingested Zantac for the treatment of acid indigestion, heartburn, sour stomach, and gastroesophageal reflux disease, which are the purposes for which the drugs were manufactured, sold, and prescribed.

221. Plaintiffs relied on the Defendants' skill or judgment to provide a product suitable for this purpose. The Defendants are in the business of designing, manufacturing, selling, and marketing prescription drugs and specialize in drugs for the treatment or prevention of acid indigestion, heartburn, sour stomach, and gastroesophageal reflux disease.

222. The Defendants had reason to know that Plaintiffs and their doctors would rely on the Defendants' skill or judgment.

223. Zantac is unfit for the purpose for which it was purchased; it is toxic to patients when put to its intended and ordinary use, causing injuries to Plaintiffs.

224. The dangers of Zantac to Plaintiffs were known and knowable to the Defendants at the time of manufacture and sale. Yet the Defendants marketed Zantac without adequate warnings

about the risks that Zantac would produce NDMA and other harmful metabolites in the body when ingested, something the Defendants knew or should have known.

225.    Plaintiffs suffered cancer and/or injuries as a result of ingesting Zantac.

226.    In addition to the common law, the conduct alleged herein constitutes a breach of the implied warranty of merchantability under the Uniform Commercial Code as codified by the following statutes:

    a.    Illinois, 810 ILCS 5/2-314;

    b.    Maryland, Md. Comm. Law Code Ann. § 2-314;

    c.    N.J. Stat. Ann. §§ 12A:1-101 to 12A:2-725;

    d.    12 A Okl. St. Ann. § 2-314; and

    e.    Texas, Tex. Bus. & Com. Code § 2314.

227.    On October 25, 2018, Plaintiffs sent a letter to Defendants via certified mail giving official notice of the Defendants' breach of the implied warranty of merchantability under the laws of Illinois, Maryland, New Jersey, Oklahoma and Texas. Plaintiffs' notice letter is attached as Exhibit A.

## COUNT IX

### MEDICAL MONITORING

228.    This Count is brought by Plaintiff Paul Burpulis against Defendant Boehringer under New Jersey law. Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

229.    Plaintiff Paul Burpulis has not yet manifested a cancer proximately caused by Defendants' conduct, but is at an increased risk of developing a cancer resulting from his Zantac usage.

230.    As alleged above, when ingested, Zantac metabolizes into NDMA and other harmful metabolites in the body. NDMA is classified as a probable human carcinogen by most, if not all, regulatory agencies around the world, including the U.S. FDA and EPA.

231.    Cancer may have a latency period of many years, and may take years to manifest. Plaintiff Burpulis is at an increased risk of developing cancer as he consumed and/or ingested Zantac for extended periods of time, and as a result was exposed to harmful levels of NDMA and other metabolites.

232.    NDMA is a hazardous, life-threatening, toxic substance that is known to cause cancer in humans.

233.    Plaintiff Burpulis is at an increased risk of cancer as he was exposed to, consumed, and/or ingested Defendants' Zantac in quantities, and over periods of time, sufficient to establish an exposure level that is considered to be hazardous to health, and that is considered to be sufficient to cause cancer or increase the risk of developing cancer.

234.    The exposure was caused solely and proximately by Defendants' Zantac.

235.    Defendants had a duty to the Plaintiff to: refrain from selling an unreasonably dangerous product; to disclose to Plaintiff that as a result of taking Zantac, NDMA and other harmful metabolites would likely form in the human body; and to ensure that Zantac was safe, reliable, and non-hazardous for human consumption—its intended purpose.

236.    As fully alleged above, Defendants' own negligent acts and omissions resulted in cancer, or an increased risk of developing cancer, for Plaintiff. Cancer is a serious disease-causing, life-threatening illness and debilitating cellular, genetic, and physical injury. Technology, analytical tools, tests, and/or monitoring procedures exist and are readily available to provide for the testing

and early detection of cancer in patients. These technologies, tools, tests, and/or monitoring procedures are accepted and widely used by the scientific and medical community. These existing scientific methods include, but are not limited to, guaiac-based fecal occult blood test (gFOBT), fecal immunochemical test (FIT), FIT-DNA test, Flexible Sigmoidoscopy, Colonoscopy, and CT Colonography (Virtual Colonoscopy).

237.    Early detection of cancer in patients is one of the best, and sometimes the only, means to treat cancer such that it does not cause lasting, permanent injury, illness, or death.

238.    Early detection of cancer in patients necessarily allows patients to avail themselves of myriad forms of treatment, each of which is capable to altering the course of the illness, such as bringing the cancer into remission, removal of any malignant tumors, and other treatment to alleviate injury.

239.    The tests and treatments for the early detection and treatment of cancer must be prescribed by a qualified physician, and are conducted according to the latest, contemporary, and widely accepted scientific principles. Because NDMA-associated cancer screenings may not be conducted with the frequency necessary to identify cancer in the absence of exposure to NDMA, the prescribed monitoring regime is different from that normally recommended in the absence of exposure. Plaintiff requires more frequent screenings not within the purview of routine medical exams.

240.    Plaintiff seeks injunctive and monetary relief, including compensatory damages for, the costs of, medical monitoring procedures (1) to provide for necessary testing and screening including, but not limited to, blood tests, physical examinations, imaging, colonoscopies, endoscopies, and other similar methods for examination, biopsies, pathologic, histologic, and

oncologic evaluations, oncologic, histologic, surgical and other necessary medical consultations; (2) to provide for necessary medical and surgical procedures for diagnosis and treatment; (3) to provide for all necessary evaluations and treatment; and (4) attorneys' fees, costs, interest, and such further relief as the Court deems equitable and just.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter an order or judgment against Defendants, including the following:

A.  Actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

B.  Exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

C.  Costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

D.  Such other and further relief as the Court deems just and proper.

## VIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: October 25, 2019

Respectfully submitted,

By: /s/ Craig A. Raabe

Craig A. Raabe (ct04116)
IZARD, KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
craabe@ikrlaw.com

Robert C. Hilliard (*pro hac vice forthcoming*)
HILLIARD MARTINEZ GONZALEZ L.L.P.
719 S. Shoreline Blvd.

Corpus Christi, TX 78401
Telephone: (361) 882-1612
bobh@hmglawfirm.com

Steve W. Berman (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Jason A. Zweig (*pro hac vice forthcoming*)
Zoran Tasić (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
jasonz@hbsslaw.com
zorant@hbsslaw.com

*Attorneys for Plaintiffs*

# Exhibit A

T 708.628.4949    F 708.628.4950



Jason A Zweig
Partner
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 N. CITYFRONT PLAZA DRIVE
SUITE 2410
CHICAGO, IL 60611
www.hbsslaw.com
(708) 628-4949
**jasonz@hbsslaw.com**

October 25, 2019

**Via Certified Mail**
<u>Return Receipt Requested</u>

Sanofi-Aventis U.S. LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**Via Certified Mail**
<u>Return Receipt Requested</u>

Chattem, Inc.
c/o Corporation Service Company
2908 Poston Ave
Nashville, TN 37203-1312

**Via Certified Mail**
<u>Return Receipt Requested</u>

GlaxoSmithKline, plc
980 Great West Road, Brentford,
Middlesex, England TW8 9GS

**Via Certified Mail**
<u>Return Receipt Requested</u>

**Pfizer, Inc.**
235 East 42nd Street
New York, New York 10017

**Via Certified Mail**
<u>Return Receipt Requested</u>

Sanofi US Services, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**Via Certified Mail**
<u>Return Receipt Requested</u>

Boehringer Ingelheim Pharmaceuticals, Inc.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

**Via Certified Mail**
<u>Return Receipt Requested</u>

GlaxoSmithKline, LLC
5 Crescent Drive
Philadelphia, PA 19112

Re: Notice of Breach of Implied Warranties under the laws of Illinois, Maryland,
New Jersey, Oklahoma, and Texas regarding Zantac

SEATTLE  BOSTON  CHICAGO  LOS ANGELES  NEW YORK  PHOENIX  SAN DIEGO  BERKELEY

Notice of Breach of Implied Warranty
October 25, 2019
Page 2


To Whom It May Concern:

PLEASE TAKE NOTICE that Plaintiffs George Cravens, Venus Sykes Ronald Maranto, Michael DeLuccia, Paul Burpulis, and Scott Moser have initiated a litigation in the District of New Jersey and the District of Connecticut, alleging, among other things, that Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Chattem, Inc., Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and (collectively "Sanofi" or "Sanofi Defendants"), GlaxoSmithKline, plc, GlaxoSmithKline, LLC (collectively "Glaxo"), and Pfizer, Inc. (collectively "Defendants"), failed to disclose that Zantac exposes users to unsafe levels of the carcinogen *N*-Nitrosodimethylamine (NDMA). Therefore, as a result, the Defendants, among other things, breached the implied warranties of merchantability with respect to the Zantac that Plaintiffs purchased. As a direct and proximate result of that breach, Plaintiffs have been injured and seek appropriate damages allowed by law.

Recent scientific testing conducted by Valisure LLC and ValisureRX LLC (collectively "Valisure") "has detected extremely high levels of NDMA in all lots [of ranitidine] tested, across multiple manufacturers of ranitidine products and in ranitidine reference standard," including over-the-counter Zantac.[1] Valisure is an "online pharmacy currently licensed in 38 states and an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization."[2] Valisure also is registered with the Drug Enforcement Administration and the FDA.[3] The tests conducted by Valisure show that "ranitidine can react with itself in standard analysis conditions ... at high efficiency to produce NDMA at levels well in excess of the permissible daily intake limit for this probable carcinogen."[4]

---

[1] Valisure Citizen Petition to FDA ("Citizen Petition") at 6, *available at* https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf.

[2] *Id.* at 2.

[3] *Id.*

[4] *Id.*

Notice of Breach of Implied Warranty
October 25, 2019
Page 3

The FDA has announced a permissible intake limit of 96 ng of NDMA per day.[5] But Valisure's testing—which employs the FDA's own gas chromatography/mass spectrometry ("GC/MS") protocol—detects 2,511,469 ng of NDMA per 150 mg tablet of Zantac.[6] In other words, the FDA-recommended protocol detects a quantity of NDMA in each Zantac tablet that is more than 26,000 times greater than the amount that can be safely ingested daily.

In addition to the FDA-recommended testing described above, when Zantac was tested "in conditions simulating the human stomach," the quantity of NDMA detected was as high as 304,500 ng per tablet—3100 times more than the amount that can be safely ingested daily.[7] Recent peer-reviewed scientific literature has demonstrated the existence of dangerous levels of NDMA in the urine of those who have taken ranitidine.[8]

From Zantac's commercial launch in 1983 until recently, the Glaxo Defendants have sold prescription formulations of Zantac. Sanofi has owned the U.S. rights to over-the-counter Zantac since about January 2017, and has manufactured and distributed the drug from then until the present. Previously, Defendant Boehringer owned the U.S. rights to over-the-counter Zantac and manufactured and distributed the drug from about October 2006 to January 2017. Prior to that, Defendant Pfizer (and one of its subsidiaries) manufactured and sold over-the-counter Zantac from the time it first went over-the-counter in 1996 through approximately 2005.

Plaintiffs allege that Defendants knew or had reason to know that Zantac exposes users to unsafe levels of the carcinogen NDMA: During the period that Defendants manufactured and distributed Zantac, numerous scientific studies were published showing, among other things, that ranitidine (the generic bioequivalent of Zantac) forms NDMA

---

[5] *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)*, FDA (last updated June 26, 2019) (setting "interim limits for NDMA" and other N-nitrasmines at 96 ng/day for angiotensin II receptor blockers).

[6] Citizen Petition at 6.

[7] *Id.* at 6–7.

[8] Teng Zeng and William A. Mitch, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37(6) CARCINOGENESIS 625 (Mar. 18, 2016).

Notice of Breach of Implied Warranty
October 25, 2019
Page 4

when placed in drinking water and that a person who consumes ranitidine has a 400 fold increase of NDMA concentration in their urine.[9]

Despite the weight of scientific evidence showing that Zantac exposed users to unsafe levels of the carcinogen NDMA, the Defendants never disclosed this risk to consumers on the drug's label—or through any other means. Had the Defendants disclosed that Zantac results in unsafe levels of NDMA in the human body, no person, let alone a reasonable person, would have purchased and consumed Zantac. Zantac is unfit for the purpose for which it was purchased; it is toxic to patients when put to its intended and ordinary use, causing injuries to Plaintiffs.

As a direct and proximate result of Defendants' breach of the implied warranties of merchantability, Plaintiffs developed cancers from their Zantac use. The Plaintiffs seek damages associated with their injuries, including all damages associated with their cancers, as well as punitive damages.

Best regards,

Jason A. Zweig

---

[9] *Id.*